# EXHIBIT A

# EXHIBIT A-1

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Brendan Austin (State Bar No. 301005)<br>401 9th St NW, Suite 630, Washington DC 20004<br><br>TELEPHONE NO.: (202) 386-9622   FAX NO. *(Optional)*:<br>E-MAIL ADDRESS: baustin@motleyrice.com<br>ATTORNEY FOR *(Name)*: The People of the State of California | **Electronically FILED by**<br>**Superior Court of California,**<br>**County of Los Angeles**<br>**8/31/2023 6:28 AM**<br>**David W. Slayton,**<br>**Executive Officer/Clerk of Court,**<br>**By J. Nunez, Deputy Clerk** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street, Los Angeles 90012
MAILING ADDRESS: 111 North Hill Street, Los Angeles 90012
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanly Mosk County Courthouse

CASE NAME: The People of the State of California v. Express Scripts, Inc., et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 23STCV20886<br><br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [ ] Construction defect (10) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [x] Other complaint *(not specified above)* (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [x] is  [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [x] Large number of witnesses
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [x] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [ ] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify)*: 1
5. This case [ ] is  [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 30, 2023
Brendan Austin
(TYPE OR PRINT NAME)                                                 (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

32

| SHORT TITLE | CASE NUMBER |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | 23STCV20886 |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

LASC CIV 109 Rev. 01/23
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | |

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

LASC CIV 109 Rev. 01/23            **CIVIL CASE COVER SHEET ADDENDUM**        LASC Local Rule 2.3
For Mandatory Use                  **AND STATEMENT OF LOCATION**

34

| SHORT TITLE | CASE NUMBER |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | |

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Contract**<br>(Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | |

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation (Continued)** | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☑ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

| SHORT TITLE | | | CASE NUMBER |
|---|---|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | | | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | | | ADDRESS:   500 W. Temple Street, Suite 648<br>Los Angeles, CA  90012 |
|---|---|---|---|
| CITY:<br>Los Angeles | STATE:<br>California | ZIP CODE:<br>90012 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: __08/30/2023__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

**NO FEE DUE**
GOV'T CODE § 6103

DAWYN R. HARRISON
County Counsel
SCOTT KUHN (SBN 190517)
Assistant County Counsel
*SKuhn@counsel.lacounty.gov*
ANDREA ROSS (SBN 179398)
Principal County Counsel
*ARoss@counsel.lacounty.gov*
**OFFICE OF THE COUNTY COUNSEL**
500 W. Temple Street, Suite 648
Los Angeles, CA  90012
Tel.: (213) 974-1811

**Electronically FILED by
Superior Court of California,
County of Los Angeles
8/30/2023 2:31 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk**

*Attorneys for People of the State of California*

*Additional counsel on the signature page*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Los Angeles County Counsel Dawyn R. Harrison, | Case No.:  23STCV20886 |
| *Plaintiff,* | |
| v. | |
| EXPRESS SCRIPTS, INC., EXPRESS SCRIPTS ADMINISTRATORS, LLC, MEDCO HEALTH SOLUTIONS, ESI MAIL PHARMACY SERVICE, INC., EXPRESS SCRIPTS PHARMACY, INC. OPTUMRX, INC., OPTUMINSIGHT, INC., OPTUMINSIGHT LIFE SCIENCES, INC., | |
| *Defendants.* | |

**<u>COMPLAINT</u>**

Plaintiff, the People of the State of California, acting by and through Los Angeles County

Counsel Dawyn R. Harrison ("the People"), brings this action against Express Scripts, Inc., Express

- 1 -

Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc. (referred to collectively herein as "Express Scripts," "ESI," or "Express Scripts Defendants") and OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc. (referred to collectively herein as "OptumRx," "Optum," or "Optum Defendants") (Express Scripts Defendants and Optum Defendants are collectively referred to herein as "Defendants")  in order to abate the public nuisance caused in substantial part by Defendants' unreasonable acts and omissions fueling the opioid epidemic.  Defendants collaborated with opioid manufacturers, partnering with them in the deceptive, dangerous marketing of these all too often lethal drugs and, in exchange for rebates and other payments from opioid manufacturers, placed opioids on formularies with preferred status and with little to no limits on their approval for use.  In addition, instead of reporting illegitimate prescribing and sales uniquely visible to them in the extensive data they collect, the Defendants ignored evidence of misuse, addiction, and diversion and used their data to boost their profits and manufacturers' sales at the expense of public health and safety.  In support of its claims, the People states as follows:

## INTRODUCTION

1.     This case arises from the worst human-made epidemic in modern medical history – an epidemic of addiction, overdose and death caused by an oversupply of opioids flooding communities from powerful corporations who sought to profit at the expense of the public.

2.     By now, most Americans have been affected, either directly or indirectly, by the opioid disaster. Due in substantial part to the wrongful conduct of the largest pharmacy benefit managers (PBMs) in the nation, described further below, between 1999 and 2010, the amount of prescription opioids sold annually in the U.S. quadrupled. In 2016, 289 million prescriptions for opioids were filled in the U.S. - enough to medicate every adult in America around the clock for a month.  Since the push to expand prescription opioid use began in the late 1990s, the death toll has steadily climbed, with no sign of slowing. The CDC's National Center for Health Statistics provides provisional data

on drug overdose deaths. According to the data, there were an estimated 107,622 drug overdose deaths in the United States during 2021. That is nearly a 15% increase from the estimated deaths in 2020.

3.      From 1996 through 2019, nearly 500,000 people died from an overdose involving any opioids.  The prescription opioids involved in these deaths include brand-name prescription medications like OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram, as well as generics like oxycodone, hydrocodone, tramadol, and fentanyl.

4.      Many of the overdoses from non-prescription opioids are also directly related to prescription pills. Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin. According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin. In fact, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin, and the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction.  Individuals who used prescription opioids who have turned to heroin are now frequently exposed to illicit fentanyl, with even more lethal effects.

5.      As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and 2015, the life expectancy for Americans decreased for the first time in recorded history. Drug overdoses are now the leading cause of death for Americans of every age from 22 to 68.

6.      In the words of Robert Anderson, who oversees death statistics at the Centers for Disease Control and Prevention, "I don't think we've ever seen anything like this. Certainly not in modern times." On October 27, 2017, then-President Trump declared the opioid epidemic a public health emergency.  Since that time, Health and Human Services Secretary Xavier Becerra has twice renewed the determination that "a opioid public health emergency exists nationwide."

7.      According to the CDC, the number of drug overdose deaths increased by nearly 30% from 2019 to 2020 and has quintupled since 1999. Nearly 75% of the 91,799 drug overdose deaths in

- 3 -

1    2020 involved an opioid. From 1999 to 2020, more than 263,000 people died in the United States from
2    overdoses involving prescription opioids.

3            8.      California, like many states across the country, has faced an unprecedented opioid
4    epidemic.  In 2017 there were nearly 22 million opioid prescriptions in California.  That same year
5    more than 2,190 Californians died of opioid overdose.
6

7            9.      The rate of fatal drug overdoses has increased over time.  Drug overdose death rates
8    increased in California from 10.7 per 100,000 in 2011 to 26.6 per 100,000 in 2021.  In 2021, there
9    were 7,181 opioid overdose deaths in California, which accounted for 66% of all drug overdose deaths
10   in the state.

11           10.     As is discussed more fully below, the County of Los Angeles, specifically, has also
12   been severely affected by the opioid epidemic.  In 2021 alone, there were 3,316 emergency room
13   visits related to opioid overdose, and 1,573 people in the County died from opioid overdose that year.
14

15           11.     The loss of each of these individuals cannot be adequately conveyed by statistics, nor
16   can the depth and breadth of the impact on those who survive. Because the addictive pull of opioids
17   is so strong, relapse is more common than with other drugs.

18           12.     The damage inflicted cuts across ages and generations. Many who have succumbed to
19   overdoses have overdosed more than once. Those who overdose are often not alone at the time.
20   Family members, including young children, have watched their loved ones lose consciousness or die.
21   Young children, including toddlers, also have been the direct victims of overdoses themselves after
22   coming into contact with opiates.
23

24           13.     Further, overdose deaths are not the only consequence. Children are being displaced
25   from their homes and raised by relatives or placed in the care of the County of Los Angeles ("the
26   County") care due to parents' addiction. Others lose the chance to go home. Unable to be discharged
27   from the hospital with their mothers, babies born addicted to opioids due to prenatal exposure are
28

1    being placed in the care of the County or local citizens or non-profits who do their best to comfort
2    them through the pain of withdrawal.

3         14.    The opioid crisis was fueled and sustained by those involved in the supply chain of
4    opioids, with manufacturers, distributors, pharmacies, and Pharmacy Benefit Managers ("PBMs"),
5
     including ESI and OptumRx, each playing a role.
6
7         15.    PBMs like Defendants ESI and OptumRx are administrators hired by third-party
8    payers (*e.g.*, government entities, insurers, employers) to design and administer prescription drug
9    programs.  They are paid for their services by the third-party payer, as well as through a variety of
10   other avenues they have developed as part of their business model. Their industry began with limited
11
     fiscal and administrative functions but has since evolved into far more. Now, "[a]lthough many people
12
     have never heard of [them], these powerful middlemen have enormous influence over the U.S.
13
     prescription drug system."
14
15        16.    Whether by colluding with manufacturers deceptively marketing opioids to alter
16   perceptions of opioids and increase their sales and use, pursuing further profits by placing opioid
17   drugs on their formularies with preferred status and declining to impose limits on their approval for
18   use in exchange for manufacturer rebate payments and fees, ignoring evidence of misuse, addiction,
19   and diversion in the massive data they possess and instead leveraging that data in support of efforts
20   to expand opioid sales and maintain oversupply, failing to report suspicious prescribers to law
21   enforcement, and failing to adequately monitor for, identify, and refuse to fill suspicious
22   prescriptions, PBMs have operated behind the scenes to fuel the crisis in multiple respects, while
23   concealing their role and claiming concern for the public health.
24
25        17.    PBMs are supposed to work for their clients to reduce prescription drug costs.  Yet,
26   over time, PBMs have developed a business model that does the opposite, and in doing so, they have
27   adopted business practices designed to increase the utilization of opioids and maximize their own
28

profits.  As a result, far greater quantities of prescription opioids entered the market than Defendants knew could be necessary for legitimate, safe, or appropriate medical uses.

18.     PBMs' overall business practices have not gone unnoticed in California. In 2018, Assembly Bill (AB) 315, codified in Health and Safety Code § 1385.007, "required the DMHC [Department of Managed Health Care] to convene a Task Force on Pharmacy Benefit Management Reporting." The purpose of the task force was to determine "what information related to pharmaceutical costs, if any, the [DMHC] should require to be reported by health care service plans or their contracted pharmacy benefit managers."

19.     Proposed Assembly Bill 913 would require the California State Board of Pharmacy to license and regulate pharmacy benefit managers that manage the prescription drug coverage provided by a health care service plan or health insurer in certain circumstances.  The bill would set forth various duties of PBMs, including requirements to file a report with the board. Also, it would require the board, with aggregate data received from PBMs, to establish a data retention schedule.

20.     Nationally, a small number of PBMs dominate the market in their sphere. ESI and OptumRx are two of these giants.  As of 2020, ESI and OptumRx were two of the largest PBMs in the U.S. Both are members of large, vertically integrated corporations.  ESI is the largest stand-alone PBM in the nation and self-described manager of the pharmacy benefit for more than 100 million Americans, providing PBM services to its parent, Cigna, as well as to many other insurers and payors. OptumRx provides PBM services to its parent, UnitedHealth, which is the largest commercial drug insurer in the U.S., and to other insurers and payors nationwide.

21.     ESI and OptumRx are also among the largest pharmacies in the country, and are owned by two of the largest insurance companies in the world. ESI and OptumRx are two of the largest healthcare data, consulting and analytics companies in the United States.

22.     ESI and OptumRx have a significant presence in California as well.  For example, ESI contracts with Western Health Advantage, a health plan available through California's Affordable

- 6 -

Care Act Exchange, and Blue Cross of California, among other health plans. OptumRx also contracts with Western Health Advantage, various United Health Care plans in California, and Adventist Health Plan, among others.

23.    Defendants control pharmacy networks that include various retail pharmacies throughout the country, including pharmacies in the County of Los Angeles. ESI's pharmacy network includes "nearly 64,000 pharmacies," which it contends provides an available in-network retail pharmacy within a 15-minute drive of "nearly every member's home." OptumRx controls a pharmacy network consisting of approximately 67,000 retail pharmacy locations nationwide.

24.    Defendants also dispense prescription opioids through their mail order pharmacies, serving patients nationally and throughout California, including in the County.

25.    Defendants along with their affiliated companies have more control over and insight into the flow of opioids into communities across the country than any other entities in the pharmaceutical distribution and payment chain.

26.    Because PBMs have access to data for all drug prescriptions written for individuals who receive insurance from an insurer with whom the PBM has contracted, PBMs have a unique insight into prescribing habits at both the patient and prescriber levels, as well as data on prescribing and use of opioids in the aggregate. Defendants have especially broad and deep insight, because of the expansive reach of their business. Defendants collectively have access to and analyze opioid utilization data for their approximately 166 million covered lives. Through that data, Defendants could effectively track the opioid epidemic, pill-by-pill, as it unfolded over decades and chronicle the opioid epidemic in real time.

27.    However, instead of using their data to guard against diversion and public harm, or to report suspicious prescribers, Defendants used it to further their own profits. This included offering services, in exchange for lucrative "administrative fees" ostensibly associated with administering benefits or contracts, to Purdue and other manufacturers of opioids to help them plan their marketing

efforts and boost their sales. At the same time, Defendants colluded with manufacturers to further support sales, and Defendants' own profits, through favorable placements of opioids on their standard national formularies without limits on their approval for use, paid for by manufacturers through rebates and fees.

28.     Given Defendants' dominant position in the market and their level of expertise, their clients typically accept their offered baseline standard formularies with little to no modifications. This is not surprising, as customers hire PBMs for their specialized knowledge in constructing and managing prescription drug formularies and policing pharmacy networks. In addition, there are often significant financial penalties customers would incur for deviating from standard formularies. Thus, Defendants' formularies effectively control what opioids enter the marketplace and with what restrictions. As such, PBMs are uniquely situated to address the opioid crisis, influence they have admitted in making belated, partial remedial efforts as they came under public scrutiny and pressure.

29.     Indeed, Defendants tout their substantial influence over nationwide drug utilization as one of their strongest selling points to their customers. Defendants are not bystanders in the opioid crisis; they helped fuel the fire.

30.     Defendants' role in creating and sustaining the opioid epidemic is largely hidden from public scrutiny but nevertheless facilitated the reckless promotion of opioids by manufacturers, the oversupply of opioid shipments by distributors, and the irresponsible dispensing of prescription opioids by numerous pharmacies, including through direct support and sales from their own mail order pharmacies.

31.     Defendants' conduct has had a severe and far-reaching public health consequence, the costs of which are borne by the County and other governmental entities.

32.     Defendants' conduct has created a public nuisance and a blight. Governmental entities, and the services they provide their citizens, have been strained by this public health crisis.

33.     The People bring this suit to help address the devastating march of this epidemic and to hold Defendants responsible for the crisis they helped create.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this action.   Defendants have substantially contributed to the creation of a public nuisance in the County of Los Angeles, and the County Counsel has the right and authority to prosecute this case on behalf of the People.

35.     This Court has personal jurisdiction over Defendants under California Code of Civil Procedure § 410.10.   Defendants have submitted to jurisdiction by conducting and transacting business in California on a regular and continuous basis, providing PBM services and mail order pharmacy services to entities and individuals throughout California, and providing data analytics services to entities in California or directed toward California, and by committing acts in violation of the laws of California and the United States.

36.     Venue as to each Defendant is proper in this judicial district, pursuant to California Code of Civil Procedure §§ 395 and 395.5.

## PARTIES

37.     The Plaintiff is the People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison ("the People").

38.     The County of Los Angeles ("the County") is located in Southern California and is the most populous county in the United States. The County has a population of 9.83 million residents, in 2021.

39.     The People bring this action to abate a public nuisance in the County pursuant to California Code of Civil Procedure Section 731.

### A.  Express Scripts Defendants

40.     **Defendant Express Scripts, Inc.** is a Delaware corporation registered to do business in California with its principal place of business located at One Express Way, St. Louis, Missouri.

41.     During the relevant time, Express Scripts, Inc. was directly involved in the PBM and mail order services business, as well as Express Scripts' data and research services, nationwide, including in Los Angeles County.

42.     **Defendant Express Scripts Administrators, LLC** (f/k/a Medco Health, LLC) is a Delaware limited liability company. Express Scripts Administrators, LLC is registered to do business in California with its principal place of business located at One Express Way, St. Louis, Missouri.

43.     During the relevant time, Express Scripts Administrators, LLC provided PBM services in Los Angeles County, as alleged in this Complaint.

44.     **Defendant Medco Health Solutions Inc.** (f/k/a Merck-Medco Managed Care LLC) ("Medco") is a Delaware corporation registered to do business in California with its principal place of business located at One Express Way, St. Louis, Missouri.

45.     Express Scripts acquired Medco in 2012 in a $29.1 billion deal.

46.     Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States. Medco provided PBM services to approximately 62 million members and provided mail order and data research services to customers nationwide.

47.     Following the merger, the combined company continued under the name Express Scripts. All of Medco's PBM, mail order pharmacy, and data and research business was combined into Express Scripts, and all of Medco's customers became Express Scripts' customers.  Express Scripts, Inc. became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers.

48.     As a result of the merger, Express Scripts Holding Company ("ESHC") was formed. In 2018, Cigna Corp. purchased Express Scripts Holding Company for $54 billion.

49.     In October of 2020, Express Scripts Holding Company changed its name to Evernorth Health, Inc. ("Evernorth"). Evernorth is the indirect parent of Express Scripts, Inc., along with pharmacy and research subsidiaries that operate throughout California.

50.     **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is an indirect subsidiary of Evernorth.  ESI Mail Pharmacy Service, Inc.'s principal place of business is in Missouri, at the same location as Evernorth.  ESI Mail Pharmacy Service, Inc. is licensed by the California State Board of Pharmacy.

51.     ESI Mail Pharmacy Service, Inc. dispenses opioids nationwide, and, upon information and belief, dispensed opioids into California, including Los Angeles County, during the relevant time period as a mail order pharmacy.

52.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth.  Express Scripts Pharmacy, Inc. is registered to do business in California with its principal place of business located at One Express Way, St. Louis, Missouri.

53.     Express Scripts Pharmacy, Inc., upon information and belief, dispensed opioids into California, including the County, during the relevant time period as a mail order pharmacy.

54.     Evernorth is the direct parent of and shares a physical address with Express Scripts, Inc., Express Scripts Administrators, LLC. ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, and its website includes links to both Express Scripts "Pharmacy Benefits Management" and "Express Scripts Pharmacy." "Express Scripts Pharmacy" is described as providing home delivery pharmacy services.

55.     As a unit, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions was the third largest dispensing pharmacy in the United States for the 2006 – 2014 time period.

56.     Collectively, Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts," "ESI," or "Express Scripts Defendants."

57.     In 2022, Evernorth, in large part through Express Scripts' PBM and mail order pharmacy business, generated revenue of $140.34 billion, contributing more than 75% of Cigna's revenue in 2022.

58.     Express Scripts Defendants are named for their conduct as:

- a PBM;

- a data, analytics, and research provider; and

- a mail order pharmacy (i.e. a dispenser).

59.     At all relevant times, Express Scripts Defendants performed these services in California and in the County of Los Angeles.

**B.  Optum Defendants**

60.     **Defendant OptumRx, Inc.**, is a California corporation with its headquarters in Irvine, California. OptumRx, Inc. is registered to do business in California.  OptumRx provides pharmacy benefit management services and mail order pharmacy services nationwide, including in California. OptumRx is a subsidiary of UnitedHealth Group, a healthcare and insurance company.

61.     Prior to 2011, OptumRx was known as Prescription Solutions. OptumRx was created out of a series of mergers and acquisitions.

62.     In 2012, SXC Health Solutions, another large PBM, purchased its rival, Catalyst Health Solutions Inc., in a roughly $4.14 billion deal. SXC Health Solutions renamed the company Catamaran Corp. After this, UnitedHealth Group bought Catamaran Corp in a $12.8 billion deal and merged Catamaran with OptumRx in 2015.

63.     OptumRx and all of its predecessors including, but not limited to, Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. are referred to herein as "OptumRx."

64.     OptumRx provides services to more than 129 million people through a network of more than 67,000 pharmacies.

65. In 2022, OptumRx's revenue was nearly $100 billion.

66. **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota and is registered to do business in California. OptumInsight was formerly known as Ingenix, Inc. UnitedHealth Group changed the name in 2011 after the State of New York investigated Ingenix regarding a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State and giving rise to U.S. Congressional hearings.

67. **Defendant OptumInsight Life Sciences, Inc.** is a Delaware corporation with its principal place of business located in Massachusetts. It is registered to do business in California.

68. In 2012, UnitedHealth Group renamed QualityMetric, Inc. to OptumInsight Life Sciences, Inc.

69. OptumInsight, Inc., OptumInsight Life Sciences, Inc., as well as their predecessors, successors, affiliates, including but not limited to Ingenix, Innovus, Innovus Research, i3, QualityMetric, Inc., Htanalytics, ChinaGate, and CanReg, are referred to herein as "OptumInsight."

70. OptumRx, Inc. and OptumInsight are wholly owned subsidiaries of UnitedHealth Group.

71. OptumInsight provides data, analytics, research, consulting, technology and managed service to companies nationwide. As is discussed below, OptumInsight worked with opioid manufacturers to convince prescribers, patients, and the public, including in the County, that opioids were appropriate for long term use for the treatment of chronic pain conditions and were not addictive.

72. Collectively, OptumRx and OptumInsight are referred to as "OptumRx," "Optum," or "Optum Defendants."

73. Optum Defendants are named for their conduct as:

- a PBM;

- data, analytics, and research providers; and

- a mail order pharmacy (i.e. a dispenser).

74.     At all relevant times, Optum Defendants performed these services in California and in the County of Los Angeles.

## FACTUAL ALLEGATIONS

**I.  A few large PMBs exert substantial influence in a way that is often not transparent, even to their customers.**

*What are PBMs?*

75.     "Pharmacy Benefit Managers (PBMs) are little-known but an important part of the process by which many Americans get their prescription drugs," and are "a key player in the prescription-drug supply chain[.]"

76.     "According to the Pharmaceutical Care Management Association (PCMA), the PBM trade group, PBMs process prescriptions for the vast majority of Americans." Although there exist dozens of PBMs nationwide, a select few, including ESI and OptumRx, dominate the market, as described above.

77.     PBMs are companies that administer prescription drug plans for entities that include insurers, self-insured employers, and state and federal government agencies (collectively, these entities are referred to as "plan sponsors"). PBMs review and pay claims.  PBMs also review and decide "which medications are most effective for each therapeutic use."

78.     PBMs design prescription drug benefit programs and create national formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed. They determine the number of pills per prescription, number of refills permitted, any pre-authorization requirements, co-payment amounts, and other criteria. PBMs thereafter commit to monitor their customers' drug plans and monitor their customers' utilization, including through concurrent drug utilization review ("Concurrent DUR" or "cDUR").

- 14 -
COMPLAINT

79.    Concurrent drug utilization review involves the PBMs real-time evaluation of drug therapy for potential problems, including over-utilization and clinical abuse/misuse of prescribed drugs. ESI's and OptumRx's cDUR terms in their standard client contracts required them to conduct concurrent DUR at the point of sale on all prescriptions.

80.    A PBM's plan can determine what medications will (or will not) be available, at what quantity and dosage, and how difficult it may be for a patient to receive that medication (e.g., by requiring pre-authorization).

81.    A drug formulary is a list of generic and brand name prescription drugs covered by health plans.  They are the pathways by which opioids and other drugs are dispensed across the country.  Formularies are usually divided into three to five tiers that determine consumers' cost-share amounts, or the co-payment or co-insurance consumers must pay toward the cost of a prescription. The lower tiers have lower cost-share amounts than the higher tiers. For example, a typical three-tier formulary may be designed as follows:

Tier 1: contains generic drugs with the lowest cost-share amount for consumers

Tier 2: contains preferred brand-name drugs with a cost-share amount that is higher than tier 1 but lower than Tier 3

Tier 3: contains non-preferred brand-name drugs with the highest payment by consumers

82.    In essence, because PBMs choose which drugs appear on their formularies and their standard formularies are adopted by a large number of health insurers and payors, they wield significant influence over which drugs are disseminated throughout the County and how those drugs are paid for.

83.    At the pharmacy counter, PBMs can implement "Utilization Management" ("UM") tools, which help to control the flow of prescription drugs. These tools include quantity limits, refill limits, prior authorizations ("PA"), and step edits (which require that a patient try a safer or less expensive drug before being given a more dangerous or more expensive one).

84.     PBMs wield direct, intentional control and influence over the prescribing, dispensing, reimbursement, and consumption of opioids.

85.     Defendants' standard plan designs and formularies control:

    a.   Which opioids will be available (or not available) to patients;

    b.   In what quantities the opioids will be dispensed;

    c.   At what co-pay will the opioids be dispensed;

    d.   What level of authorization will be required for the dispensing of opioids to a consumer patient; and

    e.   What less addictive pain treatments, beneficial drugs or other treatments will not be available.

86.     Defendant ESI performed all these tasks for various large insurers in California, thereby administering prescription drug plans for millions of Los Angeles County residents, including in the County.  ESI performed these tasks for County residents who received insurance from their employers or other payors that utilized ESI as a PBM.

87.     Defendant OptumRx also performed these tasks for County residents, in connection with its role as PBM for County residents who received insurance from their employers, or other payors that utilized OptumRx as a PBM.

88.     Defendants represent to their clients, patients, and the public that they design their formularies and drug programs in a manner that promotes safe use and appropriate prescribing of opioids.  For example, ESI claims that its Pharmacy and Therapeutics Committee (the "P&T Committee") considers drug safety and efficacy and "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy." ESI also claims that it uses drug utilization review to "review prescriptions for safety and effectiveness, in real-time, electronically and systematically, when presented to . . . pharmacies" and that it will "alert the dispensing pharmacy to detected issues." OptumRx makes similar claims.  In actuality, Defendants have designed their formularies and benefit

- 16 -

programs in a manner that maximizes their own profits and have refused to use its drug utilization review process to identify and control opioid misuse, fueling the opioid crisis as a result.

***PBMs and Financial Incentives from Manufacturers***

89.     Opioid manufacturers cannot effectively influence drug prescribing and opioid utilization alone.  Other participants in the drug distribution and reimbursement system play key roles in the availability of their opioids.

90.     Using their market power, PBMs, including Defendants, require and receive incentives from manufacturers to keep certain drugs on and off formularies. They also receive incentives from manufacturers through lucrative administrative fees.

91.     Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization and other utilization management tools that would slow down flow, such as quantity limits, refill limits, and step edits.  PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

92.     Generally, prescription drug manufacturers pay higher rebates for preferred formulary placement on lower tiers (i.e., tier 2 status instead of tier 3 status). This is because prescribers are more likely to write prescriptions and consumers to fill prescriptions for drugs with lower cost-share amounts.

93.     Higher priced drugs will typically generate higher rebates.  This creates an incentive to grant favorable formulary placement to brand-name, higher priced drugs such as OxyContin, a frequently diverted opioid.

94.     Under a traditional PBM pricing model, PBMs retain a portion of the payments they receive from prescription drug manufacturers and return the remainder to their third-party health plan clients. Administrative fees are not passed on, which has prompted disputes and concerns over whether rebate payments are being disguised as other revenue, such as administrative fees.

95.     Since 2014, payments to PBMs by manufacturers as rebates or fees to ensure the formulary placement of their drugs have risen by 16% per annum, and now constitute 40% or more of branded prescription drug costs.

96.     The rebates PBMs negotiate are highly confidential and, for the most part, the exact terms of the agreements between PBMs and prescription drug manufacturers are unknown to others in the supply chain and their customers – creating a pricing black box.

97.     Additionally, Defendants obtain revenue through fees from maintaining pharmacy networks, profiting from the "spread" between what clients pay them for generic prescription drugs and the amounts the PBMs reimburse to pharmacies.  In addition, retail pharmacies pay Defendants fees for every opioid sold, and Defendants reimburse the pharmacies based on the lowest available published prices while paying their own mail order pharmacies based on higher published prices for the same drugs. In other words, the more filled prescriptions a PBM administers, the higher profit it earns.

98.     Defendants further increased their profits from generic opioids by failing to put into place utilization management tools that would have reduced illegitimate use and dissemination of these drugs.

99.     Defendants resisted efforts to limit access to prescription opioids due to the revenue generated from the dispensing of opioids and concerns about the impact on the rebates Defendants received from opioid manufacturers.  It was only well after the opioid epidemic had reached its peak and public pressure had mounted that the Defendants began to utilize their unique access to data to implement utilization measures to address the unfettered access to prescription opioids which they helped create.

100.     Much of this activity is not transparent to anyone, including those who, in good faith, hire PBMs to manage their benefits. Defendants used their position to collude with manufacturers, prioritizing their own profits instead of public health.

101.    Defendants link opioid manufacturers to prescribing physicians, pharmacists, clients, and consumers with the objective of influencing drug utilization. Internal documents revealed that the ███████████████████████████████████████████████████████ ████████████████████████

102.    As part of their business model, Defendants offer services to assist manufacturers in the marketing of drugs in other ways as well, as described further below.

103.    On information and belief, and as described below, Defendants engaged in all these practices in California generally and in the County specifically.

**II. Defendants Had Access to Data Indicating Diversion, Misuse, and Abuse of Opioids But Failed to Use it to Make Meaningful Efforts to Prevent Diversion**

104.    Armed with a wealth of information and data, Defendants knew or should have known of the dangerous prescribing patterns that demonstrated issues like diversion, misuse, abuse, doctor shopping, overdose, and outsized use in the County.  Yet, upon information and belief, Defendants took no meaningful steps to report or address outlier prescribers or pharmacies or to otherwise rein in the facially suspicious volume of opioids being dispensed in the County or throughout the country.

105.    Instead, as described further below, Defendants provided manufacturers with preferred formulary status without restrictions and aided their marketing efforts even though they knew that dangerous numbers of opioids were being utilized in the County and the nation and were causing an unprecedented crisis of addiction, overdose, and death.

106.    For the entire relevant time period, Defendants have had access to extraordinary data which they extensively review and analyze for various profit-making business objectives.

107.    ESI has publicly acknowledged its unique ability to collect data.  An ESI representative has stated, "Because Express Scripts interacts with patients, pharmacies, prescribers, payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under pharmacy benefit."

108.    OptumInsight's predecessor, Ingenix, described itself as having ███████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

109.    Defendants recognize the value of their data. ████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████

110.    Apart from their research arms, Defendants can monitor their clients' opioid utilization and the overall utilization of particular opioids. They have extraordinary data across the opioid supply chain, including data showing: the volume, nature, dosage, and conditions for which health care providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed and the volume of opioids dispensed by geographic area, among other data. Defendants also track the number of opioids that move through their own mail order pharmacies.

111.    At the individual level, Defendants could monitor their data to identify conduct commonly associated with opioid misuse, addiction, and diversion, such as early refills of opioid prescriptions, multiple prescriptions for one individual or for dangerously high volumes or dosages of opioids or "doctor shopping," the practice by which individuals receive multiple opioid prescriptions from unknowing prescribers. On the prescriber level, they could identify problematic prescribers who were prescribing unreasonably high volumes of opioids to unreasonably high numbers of patients, co-prescribing opioids with drugs commonly abused with them, such as benzodiazepines or the "Holy Trinity", prescribing opioids outside the regular scope of their practice,

1   or who wrote prescriptions for the same dose and duration to all of their patients – all classic signs of

2   "pill mills."

3   112.   Thus, Defendants, like other PBMs, can see detailed information on individual

4   prescribers, prescriptions, and pharmacies, but can also aggregate that data across manufacturers,

5   patients, pharmacies, and payors.   Their visibility is both uniquely granular and comprehensive.

6

7   113.   For example, in 2013, an OptumInsight Life Sciences consultant forwarded an article

8   ████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████

11  ██████████████████████████████

12  114.   ██████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████

14  

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  115.   OptumRx's evaluation of its own data in 2017 further demonstrates the information

18  Defendants have always had at their fingertips and what they could have done with it.   ███████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  

22  ████████████████████████████████████████████████████████████████

23  ████████████

24  116.   Defendants tracked pill-by-pill data by employing advanced data analytics collected

25  from hundreds of millions of pharmacy claims. The data showed nearly every aspect of the pills'

26  movement through the prescription drug distribution and payment systems.

27

28

117.    Defendants had access to all of this data well before California and other states established their Prescription Drug Monitoring Programs in order to perform these analyses and stem the tide of the opioid crisis.

118.    Furthermore, by 2011 at the latest, Defendants had been put on notice by the Centers for Medicare and Medicaid Services (CMS) that all actors involved in the delivery of healthcare in the United States needed to take steps to address the overutilization of prescription opioids, which was contributing significantly to the growing opioid crisis.  In September of 2011, CMS sent a memorandum to "All Part D Sponsors," which included the Defendants or their predecessors, advising all recipients that Medicare data showed overutilization of opioids that was "highly indicative of drug seeking behavior due to drug abuse or diversion."  The notice urged recipients to put adequate controls in place, such as thresholds for appropriate dosing and denial of payment for any claims in excess of thresholds.

119.    CMS sent similar notices later in 2011, emphasizing the need for sponsors to identify and report potential fraud and abuse (*e.g.* drug seeking behavior) and in 2012.  The 2012 notice included guidance on improving drug utilization review controls.

120.    Defendants represented that they would identify potential fraud and abuse, giving rise to an expectation that they were identifying and addressing instances of over-prescribing and diversion.  Instead, they were making business decisions to increase their bottom line while eliminating patient safeguards in exchange for more lucrative contracts with manufacturers.

121.    Although Defendants were acutely aware of the opioid epidemic, they failed to use their extensive data to combat it, and instead helped to maintain the flow of opioids.

- 22 -
COMPLAINT

122. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ But ESI's own data demonstrated these problems as well.

123.    ESI was directly involved in the administration of Purdue's Indigent Patient Assistance Program ("IPAP"), ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

124. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

125. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

126.    Through the IPAP program in particular, ESI had a ringside seat to, and an active role in, the earliest rounds of the opioid epidemic. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

127. ███████████████████████████████████████

████████████████████████████████████████████████████

1   ████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ██████████████████████████

9   128.   ███████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████

14

15  129.   ███████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ███████████████████████████████████

20

21  130.   ███████████████████████████████████████████

22  ███████████████████████████

23  131.   ███████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28

- 24 -
COMPLAINT

███████████████████████████████████████████████████████

█████████████

132.    Outside of the IPAP program, ESI's own data capacities allowed the company to identify inappropriate use and prescribing of opioids, as seen in drug trends reports, research posters, and the 2014 ESI report *A Nation in Pain*.  The report discussed the results of ESI's review of 36 million opioid pharmacy claims, and detailed the indicia of the opioid epidemic that was apparent in the data. *A Nation in Pain* notes that the study found that 60% of patients using opioids were taking a dangerous combination of drugs that are potentially fatal, such as benzodiazepines with an opioid. The study also noted that a separate ESI study that analyzed ESI's data found that 40% of opioid prescriptions filled by members with employer sponsored drug coverage between 2011 and 2012 were written by only 5% of prescribers.

133.    This unique access alerting ESI to the problems with opioids, should have triggered a robust data review to identify signs of misuse, abuse and diversion.  This is particularly true, ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████    Yet, ESI continued its efforts to reduce barriers to OxyContin use, and promote higher volumes of opioid prescribing.

134.    While Defendants had some programs aimed at identifying high narcotic usage among patients, these programs were limited in scope and availability, and were window dressing, at best. For example, ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

- 25 -
COMPLAINT

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ██████████████

8      135.    Likewise, in 2016 the Optum Defendants ███████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 █████████

12     136.    Defendants knew or should have known from their own data that opioid abuse, overdose, and diversion were rising with the increasing amount of opioids that were being dispensed in the County and the surrounding communities—and yet they failed to take any of a number of steps they could have taken to stop it.  For example, Defendants could have implemented policies that provided easier access to non-addictive forms of pain relief, or that covered alternative, non-medication treatments for pain, or made addiction treatments more accessible.

    137.    Defendants, however, continued to prioritize their profits and decline to do anything meaningful about the opioid crisis.

    138.    ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

- 26 -
COMPLAINT

139. ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████

**III. Defendants Worked Directly With Manufacturers to Boost Opioid Sales and Aid Deceptive Marketing**

**A.  Background on Opioid Manufacturers' Deceptive Marketing of Opioids**

140.    As Purdue developed OxyContin in the mid-1990s, it knew that to expand its market and profits, it needed to change the perception of opioids from medications that were appropriate only for short-term acute pain or for palliative (end-of-life) care to medications that could be used long-term for widespread chronic conditions, like back pain, migraines, and arthritis.   Purdue, together with other opioid manufacturers, such as Teva, Janssen, and Endo, cultivated a narrative that pain was undertreated and pain treatment should be a higher priority for health care providers, and that opioids were safe, effective, and appropriate for long-term use for chronic, routine pain conditions. There were no studies that supported the claim that opioids were appropriate for chronic pain, and the manufacturers failed to disclose the lack of evidence that opioids were safe or effective long-term or the other risks from long-term use of opioids.  Purdue and other manufacturers misrepresented the risk of addiction for pain patients as modest, manageable, and outweighed by the benefits of opioid use.

141.    Purdue and other manufacturers spent hundreds of millions of dollars on promotional activities and materials that continued to falsely deny or trivialize the risk of addiction and overstate the benefits of opioids.  They deceptively marketed opioids to prescribers through advertising, websites, and in-person sales calls.  They also relied upon paid physician speaker programs, continuing medical education ("CME") seminars, non-credit education programs, treatment guidelines, mass mailings to physicians and patients, and other publications and programs they

- 27 -
COMPLAINT

developed with patient advocacy groups, professional associations, paid physicians, and other third

parties, including Defendants.

142.    The misrepresentations included claims that:

      a.  patients receiving opioid prescriptions for pain generally would not become addicted, and that doctors could use screening tools to exclude patients who might;

      b.  patients who did appear addicted were not; they were instead "pseudoaddicted" and needed more opioids;

      c.  opioids relieved pain when used long-term and were appropriate for use for chronic pain conditions;

      d.  opioids could be taken in higher and higher doses (without disclosing the increased risk to patients);

      e.  OxyContin provided 12 hours of relief (when Purdue knew that, for many patients, it did not);

      f.  opioids would improve patients' function and quality of life (while trivializing or omitting the many adverse effects of opioids that diminish patients' function and quality of life).

143.    Between the 1990s and 2011, prescriptions of oxycodone, an active ingredient in

OxyContin and other opioid drugs, more than doubled in the United States.  During the same time

period, opioid prescriptions increased some 31% from approximately 1.6 million to approximately

2.2 million.  According to a U.S. Department of Health and Human Services Fact Sheet, "[i]n 2014,

more than 240 million prescriptions were written for prescription opioids, which is more than enough to give every American adult their own bottle of pills."

144.    The opioid manufacturers have faced substantial civil and criminal liability for their roles in contributing to the opioid public health crisis, and have agreed to pay billions of dollars to address the devastation caused by their misleading marketing and other misdeeds. For example:

a.    In 2007, Purdue agreed to pay approximately $600 million in fines and other payments to resolve criminal and civil charges related to the company's misrepresentations regarding OxyContin's addiction and abuse risks;

b.    In October 2020, the Department of Justice announced that Purdue entered into a federal settlement of more than $8 billion to resolve pending criminal and civil allegations related to its marketing of OxyContin;

c.    In February 2022, the largest U.S. drug distributor and opioid manufacturer, Janssen, agreed to finalize a proposed $26 billion settlement resolving claims by states and local governments that they helped fuel the opioid epidemic;

d.    In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation regarding its role in the opioid crisis; and

e.    In August 2022, Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

**B. Defendants Worked Directly with Manufacturers to Increase Opioid Sales**

145.    Defendants worked directly with Purdue and other manufacturers to ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████

146.    ██████████████████████████████████████████

██████████████████████████████████████████████████████

- 29 -

147. ████████████████████████████████████

148. ████████████████████████████████████

149. ████████████████████████████████████

150. ████████████████████████████████████

████ Upon information and belief, these refer to sales roles, such as account executives. ████

151.   ESI cooperated with Purdue and other manufacturers to pursue profits ████████

152.

153.

154.

155.

156. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ This conduct, and the other conduct described herein, aided the overall effort by Purdue to deceptively inflate the benefits of opioids while downplaying their dangers.

157. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

158. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██

159. Purdue worked closely with OptumInsight, UHC, and OptumRx. ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



160.    Optum provided research and evidence to Purdue to support the expansion of the opioid market and promotion of beneficial use of opioids ███████ A few examples are:

    a. ███████

    b. ███████

    c. ███████

    d. ███████

161.   ███████ Thus, Optum had

1  direct knowledge of evidence gaps that existed in ████████████████████████████

2  ████████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████████

4  ████████████████

5

6        162.  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████████████

10  ████

11        163.  Optum knew from its own data that opioid abuse, overdose, and diversion were rising

12  with the increasing amount of opioids that were being prescribed and dispensed, which contradicted

13  Purdue's marketing claims that OxyContin was appropriate for chronic pain patients because, among

14  other misrepresentations, addiction was unlikely. Yet Optum continued to partner with Purdue and

15  other opioid manufacturers in their efforts to increase utilization of opioids, continued to give

16  OxyContin and other opioids preferred status on formularies, and continued to resist the

17  implementation of utilization management tools at the manufacturers' behest.

18        164.  Optum not only worked with Purdue, but other opioid manufacturers as well. ████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████

25

26        165.  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████

1

2

3      166.   Like ESI, OptumRx admittedly understands that ███████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████

13

14     167.   ██████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ██████████████████████

25     168.   More recently, in 2020, UnitedHealth Care, a subsidiary of UnitedHealth Group,

26 filed a proof of claim in Purdue's bankruptcy seeking $9.8 billion because it was the alleged victim

27 of deceptive opioid marketing. The claim form alleges that "[P]urdue spent millions of dollars on

28 promotional activities and materials that falsely den[ied] or trivializ[ed] the risks of opioid use

- 35 -
COMPLAINT
72

while overstating the benefits of using opioids for chronic pain." Like Optum's presentation, it neglects to mention, however, Purdue's spending on the marketing consulting work performed by Optum.

**IV. Defendants Facilitated and Encouraged the Use of Opioids and Flooded the Market through Self-Serving Formulary and Management Decisions.**

169.    Defendants exert significant control over the prescribing, use, and distribution of opioids throughout the nation, including California.  As described above, Defendants determine what drugs are included on their formularies and, as such, what drugs will be reimbursed.  In doing so, Defendants control what drugs are dispensed by pharmacies and used by patients.  Manufacturers tout formulary status of their drugs when marketing the drugs to prescribers, a fact that Defendants were well aware of but was not known to the County.

170.    Defendants are contractually obligated to negotiate formulary placement and rebates on behalf of their clients, for their clients' benefit, and their rebate negotiations and formulary decisions are supposed to be consistent and in accordance with their clients' larger, overall interests of providing safe and affordable drugs to their members.  Defendants know that their clients rely on them to perform their functions in the clients' and patients' best interests.  Nevertheless, in pursuit of profits, the Defendants intentionally disregarded these obligations, to the detriment of communities around the country, including Los Angeles County.

171.    ESI's and OptumRx's formularies are heavily influenced by their financial agreements with drug manufacturers, which encourage the use of opioids through preferred formulary placement and ease the prescribing of opioids by lowering copayments and failing to require prior authorization, quantity or dosage limits, or other restrictions on opioid prescriptions.

172.    As previously discussed, prior authorization requires advance approval from a health plan before a prescription drug is delivered to the patient to qualify for insurance coverage.  Prior authorization requirements aim to ensure that a medication is necessary or that the patient filling the

prescription meets the medical criteria for the use of the medication.  These requirements impose an additional but important hurdle to prescribing, which can reduce the illegitimate use and overuse of certain high-risk medications like opioids.  ESI's own studies found that ███████████ ███████████████████████████

173.   ESI's relationship with Purdue demonstrates the inherent problems in these agreements with opioid manufacturers, as well as the way ESI used them to its own advantage.  ESI's early preferential treatment of OxyContin facilitated the widespread use and over-use of the drug nationally and in the County, paving the way for the opioid epidemic.  Motivated by its own profits, ESI gave OxyContin preferred formulary status on its national formularies and acceded to Purdue's request not to impose prior authorization or other limits on the use of OxyContin.

174.   ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████

175.   ███████████████████████████████████████ ███████████████████████████████████████████ ██████████████ These early payments helped gain acceptance and use of OxyContin in the key early years after its launch and laid the foundation for the over-use, misuse, diversion and other harms that followed.

176.   ███████████████████████████████████████ ████████████████████████████████████

177.   ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████████

1 ███████████████████████████████████████

2 ████

3     178.   ████████████████████████████

4 ███████████████████████████████████████

5 ███████████████████████████████████████

6 ███████████████████████████████████████

7 ██████████████

8     179.   ████████████████████████████

9 █████████████████████████

10     180.   ████████████████████████████

11 ███████████████████████████████████████

12 ███████████████████████████████████████

13 ██████████ (emphasis added)

14

15     181.   ESI knew that its placement of OxyContin on formulary as a preferred drug ███

16 ██████ In 2012, an ESI executive acknowledged that ███████████████████

17 ███████████████████████████████████████

18 ███████████████████████████████████████

19 ███████████████████████████████████████

20 ███████████████████████████████████████

21 ███████████████████████████████████████

22 Nevertheless, ESI's preferred placement of OxyContin continued.

23     182.   While ESI represents publicly that it approves drugs for its formulary through

24 exhaustive clinical review based on their efficacy and appropriateness, as well as cost, it was actually

25 ESI's rebates that drove its decisions. ██████████████████████████

26 ███████████████████████████████████████

27 ███████████████████████████████████████

28 ███████████████████████████████████████

1

2

3

4

183.    ESI also allowed Purdue to undermine the policy for prior authorizations, as the

enticing rebates Purdue offered and paid to ESI were conditioned on the elimination or easing of

requirements for prior authorization or other restrictions on OxyContin, while also easing availability

of OxyContin by lowering copays.  Thus, in sum and substance, Purdue paid ESI in order to make

OxyContin more available to patients – and ESI complied.  As concerns arose regarding quantities

prescribed, ESI again prioritized profits from Purdue over health and safety.

184.    In its rebate relationships with PBMs, Purdue prioritized preventing the imposition of

prior authorization and other requirements that would limit access to opioids.  A former Purdue

official responsible for ensuring favorable treatment for OxyContin explained, "We would negotiate

a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior

authorization. We like to keep prior authorization off of any drug."   The former Purdue official's

relationship with Medco was especially important, so much so that, upon information and belief,

Purdue moved her geographically to be closer to Medco's New Jersey headquarters.

185.    ESI bowed to Purdue's wishes.  For example, as described by a media outlet which

obtained unsealed court records from litigation in West Virginia, state officials planned to require

prior authorization for OxyContin after noticing a surge in deaths attributable to oxycodone, the

branded drug's active ingredient, in 2001.  Specifically, 2004 deposition testimony revealed that state

officials contacted Medco, with whom it contracted to manage the state's employee health plan, and

asked the PBM to put in place a plan to limit OxyContin prescribing, but "basically they were

refused."  Another state official described similar resistance, testifying that the PBM "felt strongly,

and [it was] very, very reluctant or resistant."

186.    ESI even used its large-scale data in an effort to avoid implementing such restrictions, suggesting that in areas other than West Virginia "there were not that many prescriptions for OxyContin, it was not that much of problem."

187.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

188.    Lucrative rebates drove not only decisions regarding formulary placement and prior authorization requirements, but also quantity limits. PBMs determine criteria such as the number of pills per prescription. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████

189.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

190.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

- 40 -

191.    ESI recognizes that quantity matters when it comes to the abuse and diversion of opioids, and has acknowledged the problem of excess supply, stating that six in ten patients had or expected to have leftover opioids. Express Scripts has also acknowledged that, "[w]ith a 10-day supply of opioids, 1 in 5 become long-term users." It further cited information from the CDC showing that 25% of long-term opioid users struggle with addiction, while one in thirty-two people with dosages above 200 MME per day die.

192.    ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████

████    But ESI had long been aware of the effectiveness of UM tools. ████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████

194.    Optum has also recognized that the volume of opioids dispensed is directly related to the levels of abuse and diversion in the community. According to a "white paper" from the company, "[a]s opioids flooded the market, unused drugs became vulnerable to sale, theft or misuse." As UnitedHealth Group put it, "[t]he unprecedented volume of prescription painkillers in the market and the leftover supply sitting in homes have triggered inappropriate use—a major contributor to overdose and a potential gateway to heroin."

- 41 -

195.     OptumRx had similar rebate arrangements with Purdue Pharma and other opioid manufacturers and, because of its financial interests, provided favorable formulary status to and failed to impose reasonable restrictions on opioids that were prescribed, dispensed, and used in the County.

196.     ████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
██████████

197.     Despite its knowledge of misuse and diversion of prescription opioids, OptumRx encouraged the use of highly addictive opioids through its formulary policies.  For example, in one case, OptumRx suggested that a member using a Butrans patch consider switching to lower cost but more highly diverted alternatives, such as OxyContin or extended-release morphine.

198.     Furthermore, UnitedHealth, including its subsidiaries, "places morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first."

199.     ████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

200.     ████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

201.    As late as 2017, ███████████████████

202.    ESI, OptumRx, and other PBMs also provided cash discount cards that allowed patients to access opioids that were not covered by insurance.  Filling a prescription using a cash discount card could avoid health-plan limits.

203.    OptumRx refused ███████████████████

**V. Defendants' Publicity of Belated Efforts Effectively Admits They Could Have Acted Sooner**

204.    It was not until far too late, in 2017 at the 21st Annual Express Scripts Outcomes Symposium, that ESI announced a "solution" to lower the risks of opioids at each touchpoint of the care continuum "from safe disposal, to tools for physicians at the point of care and safety checks for dispensing pharmacies." By then, it was much too late for the millions of Los Angeles County residents who were suffering from opioid addiction.

205.    The belated steps that Defendants took demonstrate their ability to reduce the supply of opioids through appropriate formulary management steps that could, and should, have been taken far earlier.

206.    For example, ESI communicated in its 2017 Drug Trend Report that they made several efforts around the opioid epidemic including:

> [E]xtraordinary progress in reducing the amount of unnecessary and dangerous dispensing of opioids to our members through the launch of Advanced Opioid Management (Launched in 9/17)

> Average days' supply declined nearly 60% in just 90 days for patients in [the] program receiving a first-time opioid prescription.

> Plans participating in their solution observed a 60% reduction in the average days' supply per initial fill, from 18.6 days to just 7.5 days.

> Among commercial plans, the days' supply of opioids dispensed per person per year decreased 10.3%, while utilization of drugs to treat opioid dependence rose 8.5%.

207.    It was not until 2018 when ESI released its Advanced Opioid Management (AOM) program, that ESI put covered patients in greater compliance with the CDC Guidelines. The ESI program includes:

> a.  First time prescription opioid users are limited to a seven-day supply of short-acting prescription opioids.

> b.  Prior authorization is required for the first fill of a long-acting prescription opioid.

> c.  Pharmacy intervention is triggered when patient dosage across all prescription opioids reaches a certain level based on MME per day.

> d.  Through Express Scripts' proprietary clinical rules engine, the PBM identifies and sends daily alerts to prescription opioid prescribing physicians via their EHR/EMR to make them aware of duplicative therapy, misuse and abuse, medication interactions, use of multiple prescribers or pharmacies, or when their patient is approaching the MME thresholds.

208.    The Advanced Opioid Management programs utilize ESI's ongoing review of claims data that ESI has always had the ability to conduct.  There is no legitimate reason why this program,

1  or similar programs, could not have been implemented long before 2018, especially given ESI's early

2  knowledge of the abuse and diversion of opioids.

3      209.  

4

5

6

7      210.

8

9

10

11

12

13

14

15

16      211.  Also far too late, OptumRx acknowledged in September 2017 that it is

17

18

19

20

21

22

23

24

25

26      212.  OptumRx launched an "Opioid Risk Management Program" (ORM) in 2017. The

27  program is advertised as having several components, including "applying evidence-based utilization

28  management protocols after first fill to reduce excessive dosing, limit unnecessary extension of

therapy duration, mitigate abuse and diversion, and decrease exposure to harmful drug combinations through real-time medication checks at the point of sale." ██████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ The final press release notes that "OptumRx's program is showing early but meaningful potential to begin curbing the opioid epidemic in America."

213.    OptumRx's Opioid Risk Management program included various strategies, including prevention and education, minimizing early exposure, reducing inappropriate supply, treating at-risk and high-risk patients, and supporting chronic populations and those in recovery.

214.    Defendants had the capability to implement these programs long before 2017, but they did not have the corporate will to do so. Instead, for years, they chose to continue in profitable agreements with Purdue and other opioid manufacturers to give opioids preferred status on their formularies without implementing restrictions for their use, inevitably resulting in increased opioid utilization, increased opioid addiction, and increased overdose and death. They also chose to continue partnerships with Purdue and other manufacturers to provide data, develop research, and provide analyses to assist in manufacturers' deceptive opioid marketing. By 2017, when Defendants decided to take action and develop their opioid programs, more than half a million people had already died from opioid overdose.

**VI.  Defendants Disregarded their Obligations Under the Federal Controlled Substances Act and California Law in Selling Opioids from Their Own Pharmacies.**

215.    ESI operates one of the largest mail order pharmacies in the United States, dispensing opioids to patients in the County as well as throughout the United States. OptumRx also operates a mail order pharmacy that dispenses opioids to patients throughout California.  As such, Defendants are part of the closed system and are required to comply with the provisions of the federal Controlled

Substances Act ("CSA") and its implementing regulations and California law, including the California Uniform Controlled Substances Act (CA Health and Safety Code, Division 10).

216.    Defendants' obligations as registrants included the responsibility to prevent the diversion of opioids.  21 C.F.R. § 1301.71(a).  This includes an obligation to use the information available to them, such as the vast amounts of prescription and prescriber data they maintained or could access, to prevent the diversion of opioids.  Upon information and belief, ESI and OptumRx failed to utilize this data to detect or guard against diversion, and otherwise failed to meet their CSA obligations.

217.    As dispensers of opioids, ESI and OptumRx were required to ensure that adequate safeguards were in place to dispense opioids in a safe and effective manner, provide effective controls and procedures to deter and detect theft and diversion, and comply with federal controlled substances laws, such as the requirement to maintain effective controls against diversion.  *See, e.g.* 21 U.S.C. 801, *et seq.*, CA Health and Safety Code, Division 10, Uniform Controlled Substances Act.  ESI and OptumRx failed to meet these obligations.

218.    Under the federal Controlled Substances Act and California law, a prescription is legally valid only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 CFR § 1306.04(a). As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacies who fills the prescription." *Id.*

219.    A pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose. Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose. *See* 21 C.F.R. §§ 1306.04, 1306.06. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a

- 47 -

1    sufficient investigation to determine that the prescription is actually legitimate before dispensing. ESI

2    and OptumRx failed to meet these obligations in its mail order pharmacy operations.

3        220.    Instead, during the period for which ARCOS data is available (2006-2014), ESI

4    shipped over 1 billion dosage units of opioids to individuals across the nation, and OptumRx's mail

5    order pharmacy was responsible for shipping more than 185 million dosage units.

6

7        221.    Further, as described above, ESI shipped opioids to patients of high-volume

8    prescribers being targeted with Purdue's deceptive marketing campaign.

9        222.    The volume of opioids dispensed by ESI and Optum Rx is not surprising, given how

10    their mail order pharmacies operated to push as many prescriptions as possible out the door, with little

11    or no attempts to identify or resolve red flags.

12        223.    ███████████████████████████████████

13    ██████████████████████████████████████████████

14    ██████████████████████████████████████████████

15    ██████████████████████████████████████████████

16    ██████████████████████████████████████████████

17    ██████████████████████████████████████████████

18    ██████████████████████████████████████████████

19    ██████████████████████████████████████████████

20        224.    ███████████████████████████████████

21    ██████████████████████████████████████████████

22    ██████████████████████████████████████████████

23    ████████████████████████████

24        225.    ███████████████████████████████████

25    ██████████████████████████████████████████████

26    ██████████████████████████████████████████████

27    ████████████████████████████████

28

226.    Defendants' mail order pharmacies provided a vehicle for diversion to continue despite efforts to contain it. ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████

227.    In 2012, Express Scripts, Inc. and Express Scripts Pharmacy Services, Inc. agreed to pay the U.S. Government $2.75 million to settle a case against the companies. A DEA inspection revealed that from 2002 through 2006, prescription-controlled substances were diverted into illicit channels at several ESI mail order facilities located in Pennsylvania. The diversion included thefts by employees, inventory discrepancies, and failures to report to DEA losses that occurred during the mail order delivery process.   Perhaps most disturbing, the DEA also found that ESI employees generated invalid DEA registration numbers where it lacked registration numbers from pharmacists, which should have been not only a red flag, but an absolute barrier to dispensing these drugs.

228.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████

229.    ESI and OptumRx failed to comply with their obligations under federal and California controlled substance laws and failed to use reasonable care in the operation of its mail order pharmacies, permitting an untold number of opioid prescriptions to be filled and the opioids mailed, even though the pills were likely to be diverted.

## VII.  Defendants Concealed Their Unlawful Conduct

230.    Defendants' conduct described herein – colluding with manufacturers deceptively marketing opioids to alter perceptions of opioids and increase their sales, ignoring evidence of misuse, addiction, and diversion visible in their data and instead leveraging the data in further support of

- 49 -

1  manufacturers' opioid marketing, placing opioids on their formularies with preferred status and

2  without restrictions in exchange for lucrative rebates and fees from manufacturers, failing to maintain

3  effective controls against diversion in their mail order pharmacy operations, and failing to report

4  suspicious prescribers – was concealed from the County and the public at large.

5      231.    Defendants intentionally undertook efforts to conceal their conduct by misrepresenting

6  their role in the pharmaceutical marketplace as promoting safe and effective use of and appropriate

7  dispensing of opioids, by claiming to be a victim of Purdue's misconduct when they were, in fact, a

8  participant in it, and by failing to make public information in their possession and control that would

9  have revealed the truth regarding their relationships with manufacturers and their financial interest in

10  the increased utilization of opioid medications.

11      232.    Defendants had in their possession and control information that opioids were

12  addictive, data showing that large amounts of opioids were being diverted from legitimate channels,

13  and information that specific doctors and pharmacies were engaged in improper or illegal conduct.

14      233.    Defendants fraudulently hid the details of their relationships with opioid

15  manufacturers.

16      234.    The People did not and could not have known that the Defendants developed their

17  formularies based on profit and rebates, not based on the safety and efficacy of the medications as

18  they claim.

19      235.    The People did not know and could not have known that the Defendants were

20  partnering with the opioid manufacturers in their deceptive and misleading marketing of opioids.

21      236.    The People did not know and could not have known about the volume of opioids that

22  Defendants shipped into the County through their mail order pharmacy business.

23      237.    The People did not and could not have discovered through a diligent investigation

24  information demonstrating that the Defendants were engaged in the misconduct described herein.

238.     Defendants did not disclose to the People their financial incentives from Purdue or other manufactures or what they knew regarding problematic prescribers, diversion, and adverse consequences. Defendants used their knowledge and scale for their own benefit, rather than their customers', causing injury to the People.

**VIII. Defendants Created a Public Health Crisis in California by Dramatically Increasing the Availability of Opioids**

239.     By their conduct in improperly increasing opioid prescriptions and failing to address evidence of the overuse, abuse, and addiction to opioids and report suspicious prescribers, Defendants, who portray themselves as champions of public health, had financial incentives to sell higher volumes of opioids, and prioritized pursuit of profits over the well-being of the community and even their own clients. This oversupply allowed non-patients to become exposed to opioids and facilitated access to opioids for both patients who could no longer afford or otherwise access prescription opioids and individuals struggling with addiction and relapse. Individuals addicted to prescription opioids often transition to heroin due to its lower cost, ready availability, and similar high, or to the even more potent illicit opioid fentanyl.

240.     The effect of the oversupply of opioids in the County of Los Angeles has been striking. In 2016 opioids were responsible for 344 overdose deaths, which was a 56% increase from 2001.  The number of opioid overdose deaths has continued to rise, with 1,573 opioid overdose deaths in 2021.

241.     The deaths from opioid overdose represent the tip of the iceberg.  Based on 2009 data, for every overdose death there are 9 abuse treatment admissions, 30 emergency department visits for opioid abuse or misuse, 118 people with abuse or addiction problems, and 795 non-medical users.  In Los Angeles County, prescription opioid related hospitalizations increased 30% from 2006 to 2013 – from 11,230 to 14,594 – while prescription opioid related emergency department visits increased 171% in the same time period.  The number of Los Angeles County medical examiner toxicology cases testing positive for fentanyl doubled from 2015 to 2016.

242.    Rising opioid use and abuse have negative social and economic consequences far beyond overdoses.  According to an analysis by a Princeton University economist, approximately one out of every three working age men who are not in the labor force take daily prescription pain medication.  The same research finds that opioid prescribing alone accounts for 20% of the overall decline in the labor force participation for this group from 2014-16, and 25% of the smaller decline in labor force participation among women.   Many of those taking painkillers still said they experienced pain daily.

243.    The oversupply and overuse of opioids have caused additional medical conditions that have injured residents in California, specifically Los Angeles County.  A growing number of people have needed medications aimed at treating secondary effects of opioids—including not only addiction and overdose, but also side effects like constipation and sedation.  According to an analysis by the Washington Post, working-age women and men on opioids are much more likely to have four or more prescriptions from a physician (57% and 41%, respectively) than their counterparts who do not take opioids (14% and 9%, respectively). These secondary-effect medications—essentially, drugs to treat the effects of opioids—generated at least $4.6 billion in spending nationally in 2015, on top of $9.57 billion in spending on opioids themselves.

244.    The oversupply of opioids has also had a significant detrimental impact on children.  Prescription opioid use before high school graduation is related to a 33% increase in the risk of later opioid misuse.  Additionally, the adolescent misuse of opioid medications greatly predicts the later use of heroin.

245.    In Los Angeles County, at least 6 students overdosed on narcotics during the first two months of the 2022 school year.  Los Angeles Unified School District recently announced that it was making naloxone available at each of the K-12 schools in the district after a number of teenagers died from opioid overdose in school.

246.     Even infants have not been immune to the impact of opioid abuse.  There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS").  These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms.  The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued, serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction.  When untreated, NAS can be life-threatening.  In 2009, more than 13,000 infants in the United States were born with NAS, or about one every hour.

247.     Based on research provided by the Los Angeles County Department of Public Health, NAS rates have been increasing in L.A. County and California. In 2012, there were 122 NAS babies per 1,000 live births, up from 87 cases in 2008.

248.     The following chart shows California and Los Angeles County NAS rates since 2008.



Los Angeles County and California

- 53 -

249.    Defendants' conduct also created an abundance of drugs available for non-medical or criminal use and fueled a new wave of addiction, abuse, and injury.

250.    Most illicit drug use originates from prescribed opioids. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from drug dealers or the internet.  The Partnership to End Addiction reports that "[t]wo-thirds of teens and young adults who report misuse of prescription medicine are getting it from friends, family and acquaintances."

251.    Those who are addicted to prescription opioids are 40 times more likely to become addicted to heroin.  The CDC identified addiction to prescription pain medicine as the strongest risk factor for heroin addiction.  An even more deadly problem stemming from the prescription opioid epidemic involves illicit fentanyl – a powerful opioid frequently combined with and sold as heroin, or combined with other drugs.

252.    Fentanyl has been an increasingly devastating problem in California.  In 2022, fentanyl accounted for 83% of California opioid overdose deaths.  In 2021, 1,396 people died from fentanyl overdose in the County of Los Angeles, which was the highest number of fentanyl related deaths among California counties that year.

253.    Narcan has been a helpful, life-saving resource for the County of Los Angeles.  In addition to ensuring that all police officers are trained on the use of naloxone in order to reduce fatal opioid overdoses, the County offers training and education to opioid users, their families, and community partners that work or may come into contact with people at risk of overdosing.

254.    The Overdose Education and Naloxone Distribution (OEND) program is a program of the Los Angeles County Department of Health Services (DHS) which aims to reduce opioid overdose deaths in LA County by teaching people at risk of an overdose, and those close to them, how to

prevent, recognize, and respond to an overdose using naloxone. OEND includes a list of existing community naloxone access points prioritizing naloxone for individuals at highest risk for overdose.

255.    Earlier this year, Governor Newsom awarded $52 Million in Opioid Prevention and Treatment for proposed new investments to reduce overdoses, support recovery efforts, education, and more. "As part of the 2023-2024 state budget, Governor Newsom proposed additional initiatives to distribute naloxone, provide overdose medication to all middle and high schools, make test strips available, and grants for education, testing, recovery and support services."

256.    One prevention strategy used by Los Angeles County was the engagement of emergency departments to reduce diversion and misuse. The County "disseminated guidelines that encouraged ER doctors to: use opioids as a last resort and only for non-cancer patients with severe pain; give the lowest dose possible; avoid intravenous or injectable opioids in patients already taking opioid meds; do not replace "lost" or "stolen" opioid prescriptions; only prescribe a limited supply; use the state's CURES database to determine if a patient is a drug seeker; and prescribe generic painkillers, which have a lower street value."

257.    Another initiative by the LA County Department of Public Health Substance Abuse Prevention and Control Division (DPH-SAPC) is RecoverLA, a "user-focused, community-responsive, mobile-friendly SUD and overdose (OD) prevention resource and referral support guide." The goals of RecoverLA "are to connect the community with SUD information and resources in LAC (Los Angeles County), dispel myths and misunderstandings about SUD, and seek SUD treatment. The objective of RecoverLA is to facilitate and increase awareness and referral coordination to overdose prevention and SUD services and resources in LAC."

258.    The proliferation of opioids and the resulting increase in use, misuse and addiction has caused other problems as well.  Many patients who become addicted to opioids will lose their jobs. Some will lose their homes and their families.  Some will get treatment, but fewer will successfully complete it; many patients will relapse, returning to opioids or some other drug.  Of those who

- 55 -

continue to take opioids, some will overdose – some fatally, some not. Others will die prematurely from related causes – falling or getting into traffic accidents due to opioid-induced somnolence; dying in their sleep from opioid-induced respiratory depression; suffering assaults while engaging in illicit drug transactions; or dying from opioid-induced heart or neurological disease.

259.    Absent the conduct of Defendants as described herein, the public health crisis caused by opioid misuse, abuse, and addiction in California, including in the County of Los Angeles, would have been averted or much less severe.

### CLAIM FOR RELIEF
### *Public Nuisance*
### Violations of California Civil Code Sections 3479 and 3480

260.    The People reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein unless inconsistent with the allegations in this Count, and further alleges:

261.    Civil Code Section 3479 provides that "[a]nything that is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance."

262.    Civil Code Section 3480 defines a "public nuisance" as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

263.    Pursuant to Section 731 of the Civil Code, this action is brought by the People to abate the public nuisance created by the Defendants in the County of Los Angeles.

264.    A public nuisance cause of action is established where a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right.

265.    Civil Code Section 3490 states that "[n]o lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right."

- 56 -
COMMPLAINT
93

266.    Each Defendant has created or assisted in the creation of a condition that is injurious to the health of and interferes with the comfortable enjoyment of life and property of entire communities or neighborhoods or of any considerable number of persons in the County of Los Angeles in violation of Civil Code Sections 3479 and 3480.

267.    The significant interference with public rights is described in detail throughout this Complaint and includes but is not limited to:

      a.  The creation and fostering of an illegal, secondary market for prescription opioids;

      b.  Easy access to prescription opioids by children and teenagers;

      c.  A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

      d.  Infants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

      e.  Employers have lost the value of productive and healthy employees; and

      f.  Increased costs and expenses relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

268.    The public nuisance is substantial and unreasonable.  Defendants' actions caused and continue to cause the public health epidemic described above in the County of Los Angeles, and that harm outweighs any offsetting benefit.

269.    Defendants have created and maintained a public nuisance through their ongoing conduct of facilitating and encouraging the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on formularies with preferred status, declining to impose limits on their approval for use in exchange for payments and fees from manufacturers, assisting in promoting but failing to disclose the real risks and appropriate limits on the use of opioids, and failing to use the wealth of data available to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion.  Their conduct caused utilization of opioids to skyrocket, and Defendants failed to take measures to restrict their utilization

even as evidence of the epidemic mounted, including in the County, flooding the County with opioids and facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the County and its residents.

270.    Defendants knew, or should have known, that their conduct would create or assist in the creation of the public nuisance – i.e., the opioid epidemic.

271.    Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used and, therefore, widely misused and diverted.  Defendants' actions were, at the very least, a substantial factor in the dissemination of misleading information about the risks and benefits of opioids for the treatment of chronic pain.  Because of Defendants' actions in using their unique position to increase the availability of opioids in the marketplace and inflate opioid sales, because of their collusion with manufacturers in the deceptive marketing of opioids, and because of Defendants' special position within the closed system of opioid distribution, without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

272.    The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

273.    Pursuant to Code of Civil Procedure § 731, the People request an order providing for abatement of the public nuisance that Defendants created or assisted in the creation of, and enjoining Defendants from future violations of Civil Code §§ 3479 and 3480.

**PRAYER FOR RELIEF**

The People pray that the Court:

a.  Declare that Defendants have created a public nuisance in violation of Civil Code Sections 3479 and 3480.

b.  Order Defendants to abate the public nuisance that they created in violation of Civil Code Sections 3479 and 3480.

1    c.  Enjoin Defendants from performing any further acts in violation of Civil Code Sections
     3479 and 3480.

2

3    d.  Order Defendants to pay the costs of this case.

4    e.  Provide such further and additional relief as the Court deems proper.

5

DATED:  August 30th, 2023

6

7                          **MOTLEY RICE LLC**

8                          By: */s/ Brendan Austin*
                           Brendan Austin (SBN 301005)
9                          *baustin@motleyrice.com*
                           Linda Singer, *pro hac vice to be submitted*
10                         *Lsinger@motleyrice.com*
                           Elizabeth Smith, *pro hac vice to be submitted*
11                         *Esmith@motleyrice.com*
                           401 9th Street, NW, Suite 630
12                         Washington, DC 20004
                           Tel: (202) 386-9627
13

14

15                         **OFFICE OF THE COUNTY COUNSEL**
                           **COUNTY OF LOS ANGELES**
16
                           DAWYN R. HARRISON
17                         County Counsel
                           SCOTT KUHN (SBN 190517)
18                         Assistant County Counsel
                           *SKuhn@counsel.lacounty.gov*
19                         ANDREA ROSS (SBN 179398)
                           Principal County Counsel
20                         *ARoss@counsel.lacounty.gov*
                           500 W. Temple Street, Suite 648
21                         Los Angeles, CA  90012
                           Tel.: (213) 974-1811
22

23

24

25

26

27

28

- 59 -

COMPLAINT

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 11

**23STCV20886**                                                       September 6, 2023
**THE PEOPLE OF THE STATE OF CALIFORNIA vs**                        11:04 AM
**EXPRESS SCRIPTS, INC., et al.**

Judge: Honorable David S. Cunningham III        CSR: None
Judicial Assistant: A. Rosas                     ERM: None
Courtroom Assistant: C. Concepcion         Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Court Order Re: Complex Determination;

This case is hereby determined to be complex within the meaning of Rule 3.400 of the California Rules of Court.

The case is ordered reassigned to Judge David S. Cunningham III in Department 11 at the Spring Street Courthouse for all further proceedings and for all purposes.

The case is ordered stayed until the Initial Status Conference date. Notice of Initial Status Conference is to be given by the Clerk in Department 11. No responsive pleadings may be filed until further order of the Court. Parties may file a Notice of Appearance in lieu of an Answer or other responsive pleading. The filing of a Notice of Appearance shall not constitute a general appearance, and shall not waive any substantive or procedural challenge to the complaint. Nothing herein stays the time for filing Affidavit of Prejudice pursuant to Code of Civil Procedure section 170.6.

Pursuant to Government Code section 70616 subdivisions (a) and (b), each party is ordered to pay $1,000.00 for complex fees, payable to Los Angeles Superior Court, within ten (10) calendar days of service of this order.

Any party objecting to the complex designation must file an objection with proof of service in Department 11 within ten (10) days of service of this minute order. Any response to the objection must be filed in Department 11 within seven (7) days of service of the objection. This Court will make its ruling on the submitted pleadings.

Plaintiff is ordered to forthwith serve a copy of this minute order on all parties and file a proof of service within seven (7) days of service.

 **Superior Court of California, County of Los Angeles**

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

<u>**What is ADR?**</u>

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

<u>**Advantages of ADR**</u>
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

<u>**Disadvantages of ADR**</u>
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

<u>**Main Types of ADR**</u>

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

> **Mediation may be appropriate when the parties**
> - want to work out a solution but need help from a neutral person.
> - have communication problems or strong emotions that interfere with resolution.
>
> **Mediation may <u>not</u> be appropriate when the parties**
> - want a public trial and want a judge or jury to decide the outcome.
> - lack equal bargaining power or have a history of physical/emotional abuse.

# How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion**. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
   https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

   Day of trial mediation programs have been paused until further notice.

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

LASC CIV 271 Rev. 02/22
For Mandatory Use

Page 2 of 2

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

   The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties.  The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

   *The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association
Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

   h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

   i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".
<br>                  (INSERT DATE)                     (INSERT DATE)

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____   ➤  _____
<br>         (TYPE OR PRINT NAME)                       (ATTORNEY FOR PLAINTIFF)
<br>Date:

_____   ➤  _____
<br>         (TYPE OR PRINT NAME)                     (ATTORNEY FOR DEFENDANT)
<br>Date:

_____   ➤  _____
<br>         (TYPE OR PRINT NAME)                     (ATTORNEY FOR DEFENDANT)
<br>Date:

_____   ➤  _____
<br>         (TYPE OR PRINT NAME)                     (ATTORNEY FOR DEFENDANT)
<br>Date:

_____   ➤  _____
<br>         (TYPE OR PRINT NAME)                     (ATTORNEY FOR _____)
<br>Date:

_____   ➤  _____
<br>         (TYPE OR PRINT NAME)                     (ATTORNEY FOR _____)
<br>Date:

_____   ➤  _____
<br>         (TYPE OR PRINT NAME)                     (ATTORNEY FOR _____)

Print      Save      Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:          FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| COURTHOUSE ADDRESS: | |
|---|---|
| PLAINTIFF: | |
| DEFENDANT: | |

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

     iii.    Be filed within two (2) court days of receipt of the Request; and

     iv.    Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.   No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.   If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.   If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.   If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.   The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.   Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.   Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.   References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 2 of 3

104

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR _____)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR _____)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR _____)

| Print | Save |        | Clear |
|---|---|---|---|

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 3 of 3

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                     FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐   Request for Informal Discovery Conference
   ☐   Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

LACIV 094 (new)
LASC Approved 04/11
For Optional Use

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

106

Print        Save        Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: | FAX NO. (Optional): | |
| E-MAIL ADDRESS (Optional): | | |
| ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1.  At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine.  Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2.  The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine.  In that meet and confer, the parties will determine:

    a.  Whether the parties can stipulate to any of the proposed motions.  If the parties so stipulate, they may file a stipulation and proposed order with the Court.

    b.  Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues.  For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference.  Each side's portion of the short joint statement of issues may not exceed three pages.  The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3.  All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

LACIV 075 (new)
LASC Approved 04/11
For Optional Use
**STIPULATION AND ORDER – MOTIONS IN LIMINE**
Page 1 of 2
107

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

## The following parties stipulate:

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR PLAINTIFF)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR _____)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR _____)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date: _____          _____
                                                                              JUDICIAL OFFICER

| Print | Save | | Clear |
|---|---|---|---|

**FILED**

LOS ANGELES SUPERIOR COURT

MAY 1 1 2011

JOHN A. CLARKE, CLERK

BY NANCY NAVARRO, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

General Order Re )   ORDER PURSUANT TO CCP 1054(a),
Use of Voluntary Efficient Litigation )   EXTENDING TIME TO RESPOND BY
Stipulations )   30 DAYS WHEN PARTIES AGREE
)   TO EARLY ORGANIZATIONAL
)   MEETING STIPULATION
_____)

Whereas the Los Angeles Superior Court and the Executive Committee of the Litigation Section of the Los Angeles County Bar Association have cooperated in drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los Angeles County Bar Association Labor and Employment Law Section; the Consumer Attorneys Association of Los Angeles; the Association of Southern California Defense Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California Employment Lawyers Association all "endorse the goal of promoting efficiency in litigation, and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

109

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation.  This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

ORDER PURSUANT TO CCP 1054(a)

1    by Code of Civil Procedure section 1054(a) without further need of a specific court

2    order.

3

4    DATED: _May 11, 2011_      _[signature]_

5                               Carolyn B. Kuhl, Supervising Judge of the

6                               Civil Departments, Los Angeles Superior Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

ORDER PURSUANT TO CCP 1054(a)

2019-GEN-014-00

**FILED**
**Superior Court of California**
**County of Los Angeles**

MAY 0 3 2019

Sherri R. Carter, Executive Officer/Clerk
By_____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )   FIRST AMENDED GENERAL ORDER
— MANDATORY ELECTRONIC FILING )
FOR CIVIL )
)
)
)
_____ )

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**   A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**   The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**   A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**   Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) **EXEMPT LITIGANTS**

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) **EXEMPT FILINGS**

a) The following documents shall not be filed electronically:

   i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

   ii) Bonds/Undertaking documents;

   iii) Trial and Evidentiary Hearing Exhibits

   iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

   v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

  i) Depositions;

  ii) Declarations;

  iii) Exhibits (including exhibits to declarations);

  iv) Transcripts (including excerpts within transcripts);

  v) Points and Authorities;

  vi) Citations; and

  vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.   (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day <u>before</u> the ex parte hearing.

1  b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the
2     day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte
3     application must be provided to the court the day of the ex parte hearing.

4  9) PRINTED COURTESY COPIES

5  a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must
6     be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If
7     the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom
8     by 10:00 a.m. the next business day.

9  b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of
10    electronic submission) is required for the following documents:

11    i)   Any printed document required pursuant to a Standing or General Order;
12    ii)  Pleadings and motions (including attachments such as declarations and exhibits) of 26
13         pages or more;
14    iii) Pleadings and motions that include points and authorities;
15    iv)  Demurrers;
16    v)   Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;
17    vi)  Motions for Summary Judgment/Adjudication; and
18    vii) Motions to Compel Further Discovery.

19  c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of
20    additional documents.  Courtroom specific courtesy copy guidelines can be found at
21    www.lacourt.org on the Civil webpage under "Courtroom Information."

22  10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

23  a) Fees and costs associated with electronic filing must be waived for any litigant who has
24    received a fee waiver.  (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. §
25    1010.6(d)(2).)

26  b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure
27    section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be
28    electronically filed in any authorized action or proceeding.

2019-GEN-014-00

1    11)  SIGNATURES ON ELECTRONIC FILING

2         For purposes of this General Order, all electronic filings must be in compliance with California

3         Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4         Division of the Los Angeles County Superior Court.

5

6            This First Amended General Order supersedes any previous order related to electronic filing,

7    and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8    Supervising Judge and/or Presiding Judge.

9

10    DATED:  May 3, 2019



KEVIN C. BRAZILE
Presiding Judge

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

# EXHIBIT A-2



**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544692031

## Service of Process Transmittal Summary

**TO:**   Rebecca Thompson, Legal Svs Spclst
UnitedHealth Group Incorporated (111504190770700600)
9900 BREN RD E STE 300W
MINNETONKA, MN 55343-9693

**RE:**   **Process Served in California**

**FOR:**   OptumRx, Inc.  (Domestic State: CA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Los Angeles County Counsel Dawyn R. Harrison // To: OptumRx, Inc. |
| **CASE #:** | 23STCV20886 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/11/2023 at 13:06 |
| **JURISDICTION SERVED:** | California |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Administrative Assistant  legalmail@uhg.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 330 N BRAND BLVD |
| | STE 700 |
| | GLENDALE, CA 91203 |
| | 877-564-7529 |
| | MajorAccountTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 1 of  1

## PROCESS SERVER DELIVERY DETAILS

**Date:**                          Mon, Sep 11, 2023
**Server Name:**                   CARLOS CANAS

| | |
|---|---|
| Entity Served | OPTUMRX, INC. |
| Case Number | 23STCV20886 |
| Jurisdiction | CA |

| Inserts | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc.,  Additional Parties Attachment form is Attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/30/2023 2:31 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk County Courthouse

111 North Hill Street, Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
23STCV20886

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brendan Austin, 401 9th St NW, Suite 630, Washington DC 20004 (202) 386-9622

DATE:  08/30/2023
*(Fecha)*

Clerk, by David W. Slayton, Executive Officer/Clerk of Court , Deputy
*(Secretario)* _____ J. Nunez _____ *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario  Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*:  OptumRx, Inc
   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | 23STCV20886 |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

Express Scripts Pharmacy, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc.

Page ___1___ of ___1___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

123

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544696965

## Service of Process Transmittal Summary

**TO:**     Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**     **Process Served in California**

**FOR:**    Express Scripts Administrators, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Los Angeles County Counsel Dawyn R. Harrison // To: Express Scripts Administrators, LLC |
| **DOCUMENT(S) SERVED:** | Summons, Cover Sheet(s), Instructions, Complaint(s), Cover Sheet, Resolution, Stipulations, Stipulation And Order, Order, First Amended General Order |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Central District, CA Case # 23STCV20886 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Opioid |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/11/2023 at 13:05 |
| **JURISDICTION SERVED:** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S)/SENDER(S):** | Brendan Austin Dawyn R. Harrison 401 9th St NW, Suite 630 Washington, DC 20004 202-386-9622 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/12/2023, Expected Purge Date: 09/17/2023 |
| | Image SOP |
| | Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System 330 N BRAND BLVD STE 700 GLENDALE, CA 91203 800-448-5350 MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other



information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



## PROCESS SERVER DELIVERY DETAILS

**Date:**                         Mon, Sep 11, 2023
**Server Name:**                  CARLOS CANAS

| | |
|---|---|
| Entity Served | EXPRESS SCRIPTS ADMINISTRATORS, LLC |
| Case Number | 23STCV20886 |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



126

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc.,  Additional Parties Attachment form is Attached.

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
**8/30/2023 2:31 PM**
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By J. Nunez, Deputy Clerk**

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk County Courthouse

111 North Hill Street, Los Angeles, CA 90012

**CASE NUMBER:**
*(Número del Caso):*
23STCV20886

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brendan Austin, 401 9th St NW, Suite 630, Washington DC 20004 (202) 386-9622

DATE: 08/30/2023                    Clerk, by David W. Slayton, Executive Officer/Clerk of Court , Deputy
*(Fecha)*                            *(Secretario)*  J. Nunez  *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*:  Express Scripts Administrators, LLC
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | 23STCV20886 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

Express Scripts Pharmacy, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc.

Page __1__ of __1__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

128

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544697487

## Service of Process Transmittal Summary

**TO:**   Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**   **Process Served in California**

**FOR:**   Medco Health Solutions, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Los Angeles County Counsel Dawyn R. Harrison // To: Medco Health Solutions, Inc. Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons, Attachment(s), Cover Sheet(s), Attachment(s), Complaint(s), Information Package, Stipulation(s), Discovery Conference, Stipulations and Order, Order, First Amended General Order |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Central District, CA Case # 23STCV20886 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/11/2023 at 13:06 |
| **JURISDICTION SERVED:** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S)/SENDER(S):** | Brendan Austin 401 9th St NW, Suite 630 Washington, DC 20004 202-386-9622 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/12/2023, Expected Purge Date: 09/17/2023 Image SOP Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System 330 N BRAND BLVD STE 700 GLENDALE, CA 91203 800-448-5350 MajorAccountTeam1@wolterskluwer.com |



**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544697487

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 2 of  2



## PROCESS SERVER DELIVERY DETAILS

**Date:**                          Mon, Sep 11, 2023
**Server Name:**                   CARLOS CANAS

| Entity Served | MEDCO HEALTH SOLUTIONS, INC. |
|---|---|
| Case Number | 23STCV20886 |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td><em>FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE)</em></td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc.,  Additional Parties Attachment form is Attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison

**Electronically FILED by Superior Court of California, County of Los Angeles 8/30/2023 2:31 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

   *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk County Courthouse

111 North Hill Street, Los Angeles, CA 90012

**CASE NUMBER:**
*(Número del Caso):* **23STCV20886**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brendan Austin, 401 9th St NW, Suite 630, Washington DC 20004 (202) 386-9622

DATE: 08/30/2023
*(Fecha)*

Clerk, by David W. Slayton, Executive Officer/Clerk of Court , Deputy
*(Secretario)*  J. Nunez  *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*   Medco Health Solutions
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

132

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | 23STCV20886 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

Express Scripts Pharmacy, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc.

Page   1   of   1

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544697677

## Service of Process Transmittal Summary

**TO:**   Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**   **Process Served in California**

**FOR:**   Express Scripts, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Los Angeles County Counsel Dawyn R. Harrison // To: Express Scripts, Inc. |
| **DOCUMENT(S) SERVED:** | Summons, Cover Sheet(s), Instructions, Complaint(s), Cover Sheet, Resolution, Stipulations, Stipulation And Order, Order, First Amended General Order |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Central District, CA Case # 23STCV20886 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/11/2023 at 13:05 |
| **JURISDICTION SERVED:** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S)/SENDER(S):** | Brendan Austin 401 9th St NW, Suite Washington, DC 20004 202-386-9622 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/12/2023, Expected Purge Date: 09/17/2023 |
| | Image SOP |
| | Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System 330 N BRAND BLVD STE 700 GLENDALE, CA 91203 800-448-5350 MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other

Page 1 of  2



**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544697677

information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                              Mon, Sep 11, 2023
**Server Name:**                       CARLOS CANAS

| | |
|---|---|
| Entity Served | EXPRESS SCRIPTS, INC. |
| Case Number | **23STCV20886** |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td>FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE)</td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc.,  Additional Parties Attachment form is Attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison

**Electronically FILED by Superior Court of California, County of Los Angeles 8/30/2023 2:31 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk County Courthouse

111 North Hill Street, Los Angeles, CA 90012

**CASE NUMBER:**
*(Número del Caso):*

**23STCV20886**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brendan Austin, 401 9th St NW, Suite 630, Washington DC 20004 (202) 386-9622

DATE:  08/30/2023
*(Fecha)*

Clerk, by  David W. Slayton, Executive Officer/Clerk of Court , Deputy
*(Secretario)* _____ J. Nunez _____ *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*  EXPRESS SCRIPTS, INC.

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

**SUM-200(A)**

| SHORT TITLE: The People of the State of California v. Express Scripts, Inc., et al. | CASE NUMBER: 23STCV20886 |
| --- | --- |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

Express Scripts Pharmacy, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc.

Page __1__ of __1__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

138

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544697777

## Service of Process Transmittal Summary

**TO:**      Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**      **Process Served in California**

**FOR:**     Express Scripts Pharmacy, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Los Angeles County Counsel Dawyn R. Harrison // To: Express Scripts Pharmacy, Inc. Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons, Attachment(s), Cover Sheet(s), Complaint(s), Order(s), Stipulation(s), Informal Discovery Conference, Stipulation and Order, First Amended General Order |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Central District, CA Case # 23STCV20886 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/11/2023 at 13:06 |
| **JURISDICTION SERVED:** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S)/SENDER(S):** | Brendan Austin 401 9th St NW, Suite 630 Washington, DC 20004 202-386-9622 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/12/2023, Expected Purge Date: 09/17/2023 |
| | Image SOP |
| | Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System 330 N BRAND BLVD STE 700 GLENDALE, CA 91203 800-448-5350 MajorAccountTeam1@wolterskluwer.com |

Page 1 of  2



**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544697777

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                          Mon, Sep 11, 2023
**Server Name:**                   CARLOS CANAS

| Entity Served | EXPRESS SCRIPTS PHARMACY, INC. |
|---|---|
| Case Number | 23STCV20886 |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY *(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc.,  Additional Parties Attachment form is Attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison

Electronically FILED by Superior Court of California, County of Los Angeles 8/30/2023 2:31 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk County Courthouse

111 North Hill Street, Los Angeles, CA 90012

CASE NUMBER: *(Número del Caso):* **23STCV20886**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brendan Austin, 401 9th St NW, Suite 630, Washington DC 20004 (202) 386-9622

DATE: 08/30/2023   Clerk, by David W. Slayton, Executive Officer/Clerk of Court, Deputy
*(Fecha)*   *(Secretario)* J. Nunez *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*  Express Scripts Pharmacy Inc
   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | 23STCV20886 |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff     ☒ Defendant     ☐ Cross-Complainant     ☐ Cross-Defendant

Express Scripts Pharmacy, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc.

Page __1__ of __1__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

143

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544697844

## Service of Process Transmittal Summary

| | |
|---|---|
| **TO:** | Shayla Graham<br>Cigna Companies<br>900 COTTAGE GROVE RD<br>BLOOMFIELD, CT 06002-2920 |
| **RE:** | **Process Served in California** |
| **FOR:** | ESI Mail Pharmacy Service, Inc.  (Domestic State: DE) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Los Angeles County Counsel Dawyn R. Harrison // To: ESI Mail Pharmacy Service, Inc.<br>Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons, Attachment(s), Cover Sheet(s), Complaint(s), Order(s), Stipulation(s), Informal Discovery Conference, Stipulation and Order, First Amended General Order |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Central District, CA<br>Case # 23STCV20886 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/11/2023 at 13:06 |
| **JURISDICTION SERVED:** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S)/SENDER(S):** | Brendan Austin<br>401 9th St NW, Suite 630<br>Washington, DC 20004<br>202-386-9622 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/12/2023, Expected Purge Date: 09/17/2023<br><br>Image SOP<br><br>Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>330 N BRAND BLVD<br>STE 700<br>GLENDALE, CA 91203<br>800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

Page 1 of  2

**CT Corporation**
**Service of Process Notification**
09/11/2023
CT Log Number 544697844

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 2 of  2



## PROCESS SERVER DELIVERY DETAILS

**Date:**                                Mon, Sep 11, 2023
**Server Name:**                         CARLOS CANAS

| Entity Served | ESI MAIL PHARMACY SERVICE, INC. |
|---|---|
| Case Number | 23STCV20886 |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td><em>FOR COURT USE ONLY<br/>(SOLO PARA USO DE LA CORTE)</em></td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc.,  Additional Parties Attachment form is Attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison

**Electronically FILED by
Superior Court of California,
County of Los Angeles
8/30/2023 2:31 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr><td>The name and address of the court is:<br/>(El nombre y dirección de la corte es): Stanley Mosk County Courthouse<br/><br/>111 North Hill Street, Los Angeles, CA 90012</td><td>CASE NUMBER:<br/>(Número del Caso):<br/><br/>23STCV20886</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brendan Austin, 401 9th St NW, Suite 630, Washington DC 20004 (202) 386-9622

<table>
<tr><td>DATE:<br/>(Fecha) 08/30/2023</td><td>Clerk, by David W. Slayton, Executive Officer/Clerk of Court , Deputy<br/>(Secretario) _____ J. Nunez _____ (Adjunto)</td></tr>
</table>

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*

<table>
<tr><td>[SEAL]</td><td>
<strong>NOTICE TO THE PERSON SERVED:</strong> You are served<br/>
1. ☐ as an individual defendant.<br/>
2. ☐ as the person sued under the fictitious name of (specify):<br/><br/>
3. ☒ on behalf of (specify):   <strong>ESI Mail Pharmacy Service, Inc</strong><br/>
    under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)<br/>
            ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)<br/>
            ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)<br/>
            ☐ other (specify):<br/>
4. ☐ by personal delivery on (date):
</td></tr>
</table>

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| The People of the State of California v. Express Scripts, Inc., et al. | 23STCV20886 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

[  ] Plaintiff      [x] Defendant      [  ] Cross-Complainant      [  ] Cross-Defendant

Express Scripts Pharmacy, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc.

Page ___1___ of ___1___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

# EXHIBIT A-3

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

MAY 0 3 2019

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )
— MANDATORY ELECTRONIC FILING   )
FOR CIVIL                         )
                                  )
                                  )
                                  )
_____ )

FIRST AMENDED GENERAL ORDER

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**   A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**   The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**   A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**   Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

   a) Trial Court Records

   Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

   b) Represented Litigants

   Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

   c) Public Notice

   The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

   i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

   ii) Bonds/Undertaking documents;

   iii) Trial and Evidentiary Hearing Exhibits

   iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

   v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

2019-GEN-014-00

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

    i)    Depositions;

    ii)   Declarations;

    iii)  Exhibits (including exhibits to declarations);

    iv)   Transcripts (including excerpts within transcripts);

    v)    Points and Authorities;

    vi)   Citations; and

    vii)  Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

2019-GEN-014-00

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day <u>before</u> the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i)   Any printed document required pursuant to a Standing or General Order;

   ii)  Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii) Pleadings and motions that include points and authorities;

   iv)  Demurrers;

   v)   Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi)  Motions for Summary Judgment/Adjudication; and

   vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents.  Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver.  (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

1   11) SIGNATURES ON ELECTRONIC FILING

2       For purposes of this General Order, all electronic filings must be in compliance with California

3       Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4       Division of the Los Angeles County Superior Court.

5

6           This First Amended General Order supersedes any previous order related to electronic filing,

7       and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8       Supervising Judge and/or Presiding Judge.

9

10      DATED:  May 3, 2019                    

11                                              KEVIN C. BRAZILE

12                                              Presiding Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7
FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

# EXHIBIT A-4

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 11

**23STCV20886**                                                   September 6, 2023
**THE PEOPLE OF THE STATE OF CALIFORNIA vs**                           11:04 AM
**EXPRESS SCRIPTS, INC., et al.**


Judge: Honorable David S. Cunningham III          CSR: None
Judicial Assistant: A. Rosas                      ERM: None
Courtroom Assistant: C. Concepcion                Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances


**NATURE OF PROCEEDINGS:** Court Order Re: Complex Determination;

This case is hereby determined to be complex within the meaning of Rule 3.400 of the California Rules of Court.

The case is ordered reassigned to Judge David S. Cunningham III in Department 11 at the Spring Street Courthouse for all further proceedings and for all purposes.

The case is ordered stayed until the Initial Status Conference date. Notice of Initial Status Conference is to be given by the Clerk in Department 11. No responsive pleadings may be filed until further order of the Court. Parties may file a Notice of Appearance in lieu of an Answer or other responsive pleading. The filing of a Notice of Appearance shall not constitute a general appearance, and shall not waive any substantive or procedural challenge to the complaint. Nothing herein stays the time for filing Affidavit of Prejudice pursuant to Code of Civil Procedure section 170.6.

Pursuant to Government Code section 70616 subdivisions (a) and (b), each party is ordered to pay $1,000.00 for complex fees, payable to Los Angeles Superior Court, within ten (10) calendar days of service of this order.

Any party objecting to the complex designation must file an objection with proof of service in Department 11 within ten (10) days of service of this minute order. Any response to the objection must be filed in Department 11 within seven (7) days of service of the objection. This Court will make its ruling on the submitted pleadings.

Plaintiff is ordered to forthwith serve a copy of this minute order on all parties and file a proof of service within seven (7) days of service.

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 11

**23STCV20886**                                           September 6, 2023
**THE PEOPLE OF THE STATE OF CALIFORNIA vs**                11:04 AM
**EXPRESS SCRIPTS, INC., et al.**


Judge: Honorable David S. Cunningham III        CSR: None
Judicial Assistant: A. Rosas                    ERM: None
Courtroom Assistant: C. Concepcion              Deputy Sheriff: None

Certificate of Mailing is attached.

# EXHIBIT A-5

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 11

**23STCV20886**                                           September 13, 2023
**THE PEOPLE OF THE STATE OF CALIFORNIA vs**                         10:34 AM
**EXPRESS SCRIPTS, INC., et al.**

Judge: Honorable David S. Cunningham III        CSR: None
Judicial Assistant: T. Lewis                    ERM: None
Courtroom Assistant: C. Concepcion              Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Court Order Re: Scheduling Initial Status Conference

This case has been assigned to the Honorable David S. Cunningham III in Department 11, Spring Street Courthouse, for all purposes.

An Initial Status Conference is scheduled for 11/09/23 at 10:30 AM in Department 11 at Spring Street Courthouse.

The parties are to file a Joint Initial Status Conference Statement five(5) days prior to the above scheduled status conference.

The Court makes further orders pursuant to the Initial Status Conference Order signed and filed this date.

The stay imposed on 09/06/2023 is to remain until further order of the Court.

Counsel for plaintiff is to serve a copy of this Minute Order and the attached Initial Status Conference Order on all parties and file a proof of service.

Certificate of Mailing is attached.

# EXHIBIT A-6

**FILED**
Superior Court of California
County of Los Angeles

**SEP 1 3 2023**

David W. Slayton, Executive Officer/Clerk of Court

By: T. Lewis, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

The People of the State of California
　　　　　　　　　　　　Plaintiff,

　　v.

Express Scripts, Inc.
　　　　　　　　　Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 23STCV20886
INITIAL STATUS CONFERENCE ORDER
(COMPLEX LITIGATION PROGRAM)

Case Assigned for All Purposes to
Judge David S. Cunningham III

Department: SS11
Date:  November 9, 2023
Time:  10:30 a.m.

　　This case has been assigned for all purposes to Judge David S. Cunningham III in the Complex Litigation Program.  An Initial Status Conference is set for November 9, 2023 at 10:30 a.m. in Department SS11 located in the Spring Street Superior Courthouse at 312 N. Spring Street, Los Angeles, California 90012.  Counsel for all parties are ordered to attend.

　　The court orders counsel to prepare for the Initial Status Conference by identifying and discussing the central legal and factual issues in the case.  Counsel for plaintiff is ordered to initiate contact with counsel for defense to begin this process. Counsel then must negotiate and agree, as much as possible, on a case management plan.  To this end, counsel must file a Joint Initial Status Conference Class Action Response Statement five court days before the Initial Status Conference.  The Joint Response Statement must be filed on line-numbered pleading paper and must specifically answer each

1

of the below-numbered questions. Do not use the Judicial Council Form CM-110 (Case Management Statement).

1. **PARTIES AND COUNSEL:** Please list all presently-named class representatives and presently-named defendants, together with all counsel of record, including counsel's contact and email information.

2. **STATUS OF PLEADINGS:** Please indicate whether defendant has filed a Notice of Appearance or an Answer to the Complaint, and, if so, indicate the filing date(s).

3. **POTENTIAL ADDITIONAL PARTIES:** Indicate whether any plaintiff presently intends to add additional class representatives, and, if so, the name(s) and date by which these class representatives will be added. Indicate whether any plaintiff presently intends to name additional defendants, and, if so, the name(s) and date by which the defendant(s) will be added. Indicate whether any appearing defendant presently intends to file a cross-complaint and, if so, the names of cross-defendants and the date by which the cross-complaint will be filed.

4. **IMPROPERLY NAMED DEFENDANT(S):** If the complaint names the wrong person or entity, please explain why the named defendant is improperly named and the proposed procedure to correct this error.

5. **ADEQUACY OF PROPOSED CLASS REPRESENTATIVE(S):** If any party believes one or more named plaintiffs might not be an adequate class representative, including reasons of conflict of interest as described in Apple Computer v. The Superior Court of Los Angeles County (2005) 126 Cal.App.4th 1253, please explain. No prejudice will attach to these responses.

6. **ESTIMATED CLASS SIZE:** Please discuss and indicate the estimated class size.

7. **OTHER ACTIONS WITH OVERLAPPING CLASS DEFINITIONS:** Please list other cases with overlapping class definitions. Please identify the court, the short caption title, the docket number, and the case status.

8. **POTENTIALLY RELEVANT ARBITRATION AND/OR CLASS ACTION WAIVER
CLAUSES:** Please state whether arbitration is an issue in this case and attach a sample of any
relevant clause of this sort.   Opposing parties must summarize their views on this issue.

9. **POTENTIAL EARLY CRUCIAL MOTIONS:** Opposing counsel should identify and describe
the significant core issues in the case, and then identify efficient ways to resolve those issues,
including one or more of the following:

■  Motion to Compel Arbitration,

■  Early motions in limine,

■  Early motions about particular jury instructions and verdict forms,

■  Demurrers,

■  Motions to strike,

■  Motions for judgment on the pleadings, and

■  Motions for summary judgment and summary adjudication.

10. **CLASS CONTACT INFORMATION:** Counsel should discuss whether obtaining class contact
information from defendant' s records is necessary in this case and, if so,  whether the parties
consent to an "opt-out" notice process (as approved in *Belaire-West Landscape, Inc. v. Superior
Court* (2007) 149 Cal.App.4th 554, 561).   Counsel should address timing and procedure, including
allocation of cost and the necessity of a third party administrator.

11. **PROTECTIVE ORDERS:** Parties considering an order to protect confidential information from
general disclosure should begin with the model protective orders found on the Los Angeles Superior
Court Website under "Civil Tools for Litigators."

12. **DISCOVERY:** Please discuss a discovery plan.  If the parties cannot agree on a plan,   summarize
each side's views on discovery.   The court generally allows discovery on matters relevant to class
certification, which (depending on circumstances) may include factual issues also touching the

3

merits.  The court generally does not permit extensive or expensive discovery relevant only to the merits (for example, detailed damages discovery) at the initial stage unless a persuasive showing establishes early need.  If any party seeks discovery from absent class members, please estimate how many, and also state the kind of discovery you propose[1].

**13. INSURANCE COVERAGE:**  Please state if (1) there is insurance for indemnity or reimbursement, and (2) whether there are any insurance coverage issues which might affect settlement.

**14. ALTERNATIVE DISPUTE RESOLUTION:**  Please discuss ADR and state each party's position about it.  If pertinent, how can the court help identify the correct neutral and prepare the case for a successful settlement negotiation?

**15. TIMELINE FOR CASE MANAGEMENT:**  Please recommend dates and times for the following:

- The next status conference,
- A schedule for alternative dispute resolution, if it is relevant,
- A filing deadline for the motion for class certification, and
- Filing deadlines and descriptions for other anticipated non-discovery motions.

**16. ELECTRONIC SERVICE OF PAPERS:**  For efficiency the complex program requires the parties in every new case to use a third-party cloud service.  Please agree on one and submit the parties' choice when filing the Joint Initial Status Conference Class Action Response Statement.  If there is agreement, please identify the vendor. If parties cannot agree, the court will select the vendor at the Initial Status Conference.  Electronic service is not the same as electronic filing.  Only traditional methods of filing by physical delivery of original papers or by fax filing are presently acceptable.

**Reminder When Seeking To Dismiss Or To Obtain Settlement Approval:**

"A dismissal of an entire class action, or of any party or cause of action in a class action, requires

---

[1] See California Rule of Court, Rule 3.768.

4

court approval. . . .  Requests for dismissal must be accompanied by a declaration setting forth the facts on which the party relies. The declaration must clearly state whether consideration, direct or indirect, is being given for the dismissal and must describe the consideration in detail."[2] If the parties have settled the class action, that too will require judicial approval based on a noticed motion (although it may be possible to shorten time by consent for good cause shown).

**Reminder When Seeking Approval of a Settlement:**

Plaintiff(s) must address the issue of any fee splitting agreement in their motion for preliminary approval and demonstrate compliance with California Rule of Court  3.769, and the Rules of Professional Conduct 2-200(a) as required by Mark v. Spencer (2008) 166 Cal.App. 4th 219.

Pending further order of this Court, and except as otherwise provided in this Initial Status Conference Order, ***these proceedings are stayed in their entirety***. This stay precludes the filing of any answer, demurrer, motion to strike, or motions challenging the jurisdiction of the Court; however, any defendant may file a Notice of Appearance for purposes of identification of counsel and preparation of a service list. The filing of such a Notice of Appearance is without prejudice to any challenge to the jurisdiction of the Court, substantive or procedural challenges to the Complaint, without prejudice to any affirmative defense, and without prejudice to the filing of any cross-complaint in this action. This stay is issued to assist the Court and the parties in managing this "complex" case through the development of an orderly schedule for briefing and hearings on procedural and substantive challenges to the complaint and other issues that may assist in the orderly management of these cases.  This stay does not preclude the parties from informally exchanging documents that may assist in their initial evaluation of the issues presented in this case, however it stays all outstanding discovery requests.

Plaintiff's counsel is directed to serve a copy of this Initial Status Conference Order along with a

---

[2] California Rule of Court, Rule 3.770(a)

copy of the attached Guidelines for Motions for Preliminary and Final Approval of Class Settlement on counsel for all parties, or if counsel has not been identified, on all parties, within five (5) days of service of this order. If any defendant has not been served in this action, service is to be completed within twenty (20) days of the date of this order.

If all parties have been served, have conducted the required meet and confer, and are ready to fully participate in the status conference prior to the assigned date, counsel may contact the clerk of Department SS11 and request an earlier date for the Initial Status Conference.

Dated:      SEP 1 3 2023

DAVID S. CUNNINGHAM III
Judge of the Los Angeles Superior Court

# EXHIBIT A-7

FILED
Superior Court of California
County of Los Angeles

SEP 1 9 2023

David W. Slayton, Executive Officer/Clerk of Court

By: T. Lewis, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| The People of the State of California<br>Plaintiff,<br><br>vs.<br><br>Express Scripts, Inc.<br><br>Defendant | ) Case No.: 23STCV20886<br>)<br>) INITIAL STATUS CONFERENCE<br>) ORDER (COMPLEX LITIGATION<br>) PROGRAM)<br>)<br>) Case assigned for all purposes to<br>) HON. DAVID S. CUNNINGHAM III<br>)<br>) Department 11<br>)<br>) |

This case has been assigned for all purposes to Judge David S. Cunningham III in the

Complex Litigation Program.  An Initial Status Conference is set for November 9, 2023 at

10:30 a.m. in Department 11, located at Los Angeles Superior Court at the United States

Courthouse at 312 N. Spring Street, Los Angeles, California 90012.  Counsel for all parties are

ordered to attend.

1

Prior to the Initial Status Conference, Counsel for all parties are ordered to meet and confer in person (no later than 15 days before the Conference) and discuss the following areas. Additionally, counsel must be prepared to discuss these issues with the Court at the Initial Status Conference.

1. Consideration of any issues of recusal or disqualification;

2. Issues of law and/or potentially dispositive or significant threshold issues that, if considered by the Court, may simplify or further resolution of the case;

3. Appropriate alternative dispute resolution (ADR) mechanisms (e.g., mediation, mandatory settlement conference, arbitration, mini-trial, etc.);

4. A plan for preservation of evidence and uniform system for identification of documents throughout the course of this litigation;

5. A plan for document disclosure/production and additional discovery; which will generally be conducted under court supervision and by court order;

6. Whether it is advisable to address discovery in phases so that information needed to conduct meaningful ADR is obtained early in the case;

7. Any issues involving the protection of evidence and confidentiality;

8. The selection of the required electronic service provider;

9. The handling of any potential publicity issues.

Counsel for the Plaintiff is to take the lead in preparing a Joint Initial Status Conference Report to be filed five court days prior to the hearing date. The Joint Status Conference Report must include the following:

2

1. A statement as to whether additional parties are likely to be added and a proposed date by which all parties must be served;

2. Service list (service list should identify all primary and secondary counsel, firm names, addresses, telephone numbers, email addresses and fax numbers for all counsel). The Court will issue an Order requiring electronic service. Counsel are to advise the Court regarding their preferred web-based electronic service provider at the time of the conference (Case Anywhere, or LexisNexis);

3. Whether any issues of jurisdiction or venue exist that might affect this court's ability to proceed with this case.

4. Applicability and enforceability of arbitration clauses, if any;

5. A list of all related litigation pending in other courts, a brief description of any such litigation, and a statement as to whether any additional related litigation is anticipated;

6. A description of core factual and legal issues – the parties should address any specific contracts, or contract provisions, on which Plaintiff's claims are based; any specific statutes the interpretation of which will be required to adjudicate Plaintiff's claims; and any specific Regulations the interpretation of which will be required to adjudicate Plaintiff's claims;

7. The parties' tentative views on an ADR mechanism and how such mechanism might be integrated into the course of the litigation;

8. A discovery plan, including whether discovery should be conducted in phases or limited; and if so, the order of phasing or types of limitations of discovery;

3

9. A plan for discovery of electronically stored information. Regarding the production of electronically stored information, the parties are encouraged to have their respective IT consultants/employees participate in the meet and confer process. At a minimum, the following issues should be addressed with respect to the production of electronically stored information: (1) the information management systems employed by the parties; (2) the location and custodians of information that is likely to be subject to production (including the identification of network and email servers and hard drives maintained by target custodians); (3) the format in which electronically stored information will be produced; (4) the type of ESI that will be produced, i.e., data files, emails, etc.; (5) appropriate search criteria for focused requests;

10. Whether the parties are prepared to stipulate that discovery and/or pleading stays entered by the Court for case management purposes shall not be considered in determining the statutory period for bringing the case to trial under Code of Civil Procedure Section 583.310.

11. Recommended dates and times for the following:

   a. The next status conference;

   b. A schedule for alternative dispute resolution, if it is relevant;

   c. A filing deadline (and proposed briefing schedule) for anticipated non-discovery motions, if any.

   To the extent the parties are unable to agree on the matters to be addressed in the Joint Initial Status Conference Report, the positions of each party or of various parties shall be set forth separately in the Joint Statement. The parties are encouraged to propose, either jointly or

4

separately, any approaches to case management that they believe will promote the fair and efficient handling of this case. The Court is particularly interested in identifying potentially dispositive or significant threshold issues the early resolution of which may assist in moving the case toward effective ADR and/or a final disposition.

Pending further order of this Court, and except as otherwise provided in the Initial Status Conference Order, these proceedings are stayed in their entirety. This stay shall preclude the filing of any answer, demurrer, motion to strike, or motions challenging the jurisdiction of the Court; however, each defendant is directed to file a Notice of Appearance for purposes of identification of counsel and preparation of a service list. The filing of such a Notice of Appearances shall be without prejudice to any challenge to the jurisdiction of the Court, substantive or procedural challenges to the Complaint, without prejudice to any affirmative defense, and without prejudice to the filing of any cross-complaint in this action. This stay is issued to assist the Court and the parties in managing this "complex" case through the development of an orderly schedule for briefing and hearings on procedural and substantive challenges to the complaint and other issues that may assist in the orderly management of this case. This stay shall not preclude the parties from continuing informally exchange documents that may assist in their initial evaluation of the issues presented in this case, however shall stay all outstanding discovery requests.

Hereafter, all management stays, including stays of discovery issued by the Court, shall not be considered as a stay per Code of Civil Procedure section 583.310 unless specifically ordered by the Court.

5

Plaintiffs' counsel is to serve this Initial Status Conference Order on counsel for Defendant, or if counsel is not known, on Defendant within five (5) days of the date of this Order.

If the Complaint has not been served as of the date of this Order, Counsel for Plaintiff is to serve the Complaint within five (5) days of the date of this Order.

Dated:      SEP 1 9 2023

_____

DAVID S. CUNNINGHAM III
Judge of the Superior Court

6